**Dante Ricardo BOYD, Appellant,**

v.

**UNITED STATES, Appellee.**

**Nos. 98–CF–862, 00–CO–558.**

District of Columbia Court of Appeals.

Argued May 10, 2005.
Reargued Feb. 24, 2006.
Decided Sept. 28, 2006.

Denise D. Green, appointed by the court, for appellant.

Roy W. McLeese III, Assistant United States Attorney, with whom Kenneth L. Wainstein, United States Attorney at the time the brief was filed, and Chrisellen R. Kolb and Steven R. Kaufman, Assistant United States Attorneys, were on the brief, for appellee.*

Jaclyn S. Frankfurt, with whom James Klein and Samia Fam were on the brief, for the Public Defender Service, amicus curiae.

Before WASHINGTON, Chief Judges,** RUIZ, Associate Judge, and SCHWELB,*** Senior Judge.

SCHWELB, Senior Judge:

Dante Ricardo Boyd was convicted by a jury of first-degree murder, felony murder, kidnapping, attempted kidnapping, conspiracy, and related firearms offenses.[1] On appeal, supported by the Public Defender Service (PDS) as amicus curiae, Boyd contends, *inter alia:*

1. that the government's prosecution of Boyd on the basis of a factual theory allegedly different from, and irreconcilable with, the factual theory relied on by the government to secure the conviction of Boyd's former codefendant, Wendell Craig Watson, deprived Boyd of his liberty without due process of law, in violation of the Fifth Amendment; and

2. that the government violated its obligations pursuant to *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), by failing to provide Boyd with material exculpatory statements by prospective witnesses; Boyd also claims that the trial judge abused her discretion by declining to examine the relevant statements *in camera.*

The government responds that the due process claim based on allegedly irreconcilable prosecution theories was not preserved, and that in any event this claim lacks substantive merit. The government further asserts that it has complied with all of its obligations pursuant to *Brady.*

We conclude that although the prosecutor should have revealed to the jury in Boyd's case that the government's factual theory had changed on a material issue from the position the government took at Watson's trial, Boyd is not entitled to reversal on that ground, for the inconsistency in the government's theory did not go to the core of its case. We further conclude that the potentially exculpatory statement of at least one prospective witness who had been interviewed by the police should have been provided to the defense, and that the trial judge abused her discretion in declining to review, *in camera,* two other allegedly exculpatory statements. We remand the case for further proceedings with respect to the *Brady* issue.

## I.

## BOYD'S DUE PROCESS CLAIM

A. *Background.*

A grand jury indicted four young men— Corey Shaw, Wendell Craig Watson, Jovan

---

* On May 10, 2005, *Steven R. Kaufman,* Assistant United States Attorney, argued for appellee.

** Judge Washington was an Associate Judge of the court at the time of argument. His status changed to Chief Judge on August 6, 2005.

*** Judge Schwelb was an Associate Judge of the court at the time of argument. His status changed to Senior Judge on June 24, 2006.

1. The trial court granted Boyd's motion for judgment of acquittal with respect to a charge of carrying a pistol without a license.

(Tweety) James, and Dante Ricardo (Deadeye Rick) Boyd—for the armed kidnapping and execution-style murder of Darryl Hall (aged twelve) and for the attempted kidnapping of Darryl's older brother, D'Angelo Hall, who was then fourteen. The murder and attempted kidnapping apparently arose out of a feud between two "crews" or gangs of young men and boys in southeast Washington, D.C. The two factions were known as the "Circle Crew," which allegedly included Boyd and his codefendants, and the "Avenue Crew," to which the Hall brothers are said to have belonged. During the winter of 1996–97, members of the two crews fired gunshots at each other, and shots were fired into the home of Dante Boyd's mother, in what the government describes in its brief as "an ever-increasing cycle of retaliation." This cycle culminated in the horrifying murder of a twelve-year-old boy.

The evidence at Boyd's trial, much of it undisputed and consistent with the evidence at Watson's trial, showed that on January 15, 1997, two or more of the accused men drove in a brown station wagon to the Hall brothers' school, Fletcher–Johnson Junior High School, and arrived there during the lunch break. The men's apparent purpose was to conduct reconnaissance regarding the two boys' route home. After speaking to Boyd's sister, Antee Boyd, who was a pupil at the school, the men in the station wagon departed. At least three of the accused men later returned to an alley near the school in the same station wagon when classes ended at approximately 3:30 p.m. The men soon spotted, chased, and apprehended Darryl,[2] placed him in the station wagon, stopped at an apartment house at which Jovan James picked up a "Mac 11" handgun, and drove to a wooded area near Ridge Road, S.E. James then took Darryl out of the car, walked him to the woods, and shot him through the head. The principal issue at Boyd's trial was whether or not Boyd was one of the participants in these crimes.

The cases of Boyd's three codefendants were all resolved prior to Boyd's trial. Corey Shaw entered a plea of guilty to second-degree murder before any defendant was tried. Apparently in order to avoid *Bruton*[3] problems, the government elected to try Watson separately from James and Boyd.

Watson's trial began in November 1997. The government's theory at that trial was that Watson aided and abetted James in committing the murder, first by participating in the planning of the crime, and second, by driving James and the other kidnappers to and from the murder scene. Watson admitted that he participated in the kidnapping and that he drove the car, but he asserted a partial defense of duress, claiming that he was afraid of James and Shaw. On December 1, Watson was convicted of felony murder, conspiracy, the kidnapping of Darryl Hall, the attempted kidnapping of D'Angelo Hall, and related firearms charges.

On February 20, 1998, shortly before James and Boyd were scheduled to go to trial, James entered a plea of guilty to first-degree murder. Boyd was therefore tried alone. Thus, by the time Boyd's trial began, the three other accused men— Shaw, Watson, and James—had all admitted their participation in the offenses, and all three had been convicted, Shaw and James on the basis of their guilty pleas, and Watson following an unfavorable jury verdict. Boyd presented an alibi-type de-

---

**2.** The kidnappers also pursued D'Angelo, but they were unable to catch him.

**3.** *Bruton v. United States,* 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968).

fense, and the principal issue at his trial was whether the murder and attempted kidnapping were committed by four men (as the prosecution claimed) or by three men (as the defense contended). Obviously, if only three men participated in the crimes, and all three had confessed their roles, then Boyd could not have been one of the three murderers. At the conclusion of the trial, Boyd was convicted of first-degree premeditated murder, felony murder, conspiracy, kidnapping, attempted kidnapping, and firearms charges.

## B. *Watson's trial.*

At Watson's trial, the government's theory was that Watson helped to plan the murder and kidnapping and that he aided an abetted James in the killing of Darryl Hall, *inter alia*, by driving James to and from the murder scene. In his opening statement, the prosecutor told the jury that

> the evidence in this case is going to show beyond a reasonable doubt that after he was grabbed off the street, he was stuffed into a *[car] being driven by this man, Wendell Craig Watson....*
>
> \* \* \*
>
> *Craig Watson then drove to the area near the rec center near Burns and Ridge Road in southeast.*
>
> \* \* \*

At this point, [Darryl] was utterly defenseless. Unable to even run away, much less defend himself or pose a threat to Jovan James.

At this point, Jovan James raised his gun again and fired a bullet into the back of little Darryl's head, killing him.

Jovan James and D[a]nte Boyd then walked out of the woods to the waiting car where Wendell Craig Watson and Corey Shaw were waiting. *Wendell Craig Watson then drove them back to the 600 block of 46th Place, Southeast.* (Emphasis added.)

The government's case was consistent with the prosecutor's opening. The evidence against Watson consisted primarily of Watson's own statements, first to the police and then to the grand jury. Watson initially told the police, and asserted to the prosecutors, that although he was present at the kidnapping and drove the station wagon to and from the site of the murder, he played no part in the planning of the crime. Watson also initially reported that Dante Boyd was not involved in any way. The prosecutors were dissatisfied with Watson's denial that he played any part in the conspiracy and with his exoneration of Boyd. After a polygraph test was administered to Watson, however, he testified before the grand jury that he did in fact help to plan the kidnapping and murder, and he also implicated Boyd in the crime. Watson told the grand jury, *inter alia,* that all four men were present at the scene of the kidnapping, but that Boyd remained in the station wagon while Watson, James, and Shaw were apprehending Darryl.[4] In both of the foregoing accounts, Watson acknowledged that it was he who drove the station wagon to and from the murder scene. The prosecution also introduced a statement against penal interest by James in which James confirmed that Watson was driving the car. According to James, he, Watson, and Shaw decided to snatch and kill Darryl Hall, and only the three of them were involved in the abduction, with Watson doing the driving and James doing the shooting. Like Watson, James stated that Boyd was not involved at all.[5]

---

4. Watson told the grand jury that he and Shaw agreed to conceal Boyd's role in the crimes because they feared retaliation against their families.

5. During the proceeding at which James en-

Watson testified in his own defense. He claimed that he had not wanted to participate in a murder and that he had tried to leave the car, but that he was afraid of Corey Shaw and Jovan James.[6] Watson reiterated that he was driving the car throughout the episode. He testified that he had falsely told the grand jury that he was involved in the planning of the murder (and that he had lied when he accused Boyd) because his lawyer had pressured him to say whatever the prosecutors wanted to hear. Watson's brother, Vincent Watson, testified for the defense. Vincent confirmed that his brother opened the door as if trying to get out of the car, and he too stated that Wendell Craig Watson was behind the wheel.

In his closing argument, the prosecutor returned to the theme that Watson was an aider and abettor:

> Craig Watson knows Jovan James has a gun. He sees him come out of the house with a Mac[ ] 11 on a shoestring. He helps him. He drives him to the scene and he waits for him to murder Darryl and then he drives away. He's aiding and abetting a murder, first-degree murder, premeditated.

The prosecutor also specifically represented to the jury that Watson's grand jury testimony was the truth:

> When you go through [the cassette tapes of Watson's grand jury testimony], you will see when you listen to this, as you did in court, that [Watson] was telling the truth in grand jury. He was giving it up. He was coming clean. The whole story, the whole truth. . . . You can listen to them again and again and you can hear in his own voice, from his own lips, the truth about what happened on January 15th.[7]

Watson, as previously noted, was convicted of felony murder, kidnapping, and related charges.[8]

## C. Boyd's trial.

On February 27, 1998, just over three months after he had vouched for the truth of Watson's grand jury testimony and secured Watson's conviction as the aider and abettor who drove the car, the same prosecutor stood before the same judge, who had heard his prior representations, but before a different jury, which had not. On this occasion, however, the prosecutor's opening statement was dramatically (and astonishingly) different:

---

tered his guilty plea, however, James agreed to a proffer by the prosecutor which identified Boyd as a participant in the crimes.

**6.** James admitted that he threatened to kill Watson if Watson "snitched."

**7.** In insisting that Watson's grand jury testimony was the truth, the prosecutor was obviously focusing on Watson's admission that he had helped to plan the murder, for on the witness stand, Watson denied participation in the conspiracy. The fact that Watson was behind the wheel was not in dispute at Watson's trial, and the point required no emphasis from the prosecutor. In our view, the insistence by PDS in its amicus brief that the prosecutor was guaranteeing the truth of a proposition not then in issue—namely that

Watson was the driver—is not as persuasive as PDS claims it to be.

**8.** It was the government's theory at Watson's trial that Boyd was also present at the kidnapping and murder, and that he was in the station wagon while his confederates were seizing Darryl. In his closing argument, the prosecutor stated:

> [T]here is no dispute . . . that there was a conspiracy, an agreement between [Watson] and Jovan James, Corey Shaw, and we would submit D[a]nte Boyd, but whether D[a]nte Boyd was there is of no consequence to you.

The prosecutor never suggested, during Watson's trial, that Boyd was not a participant in the crime.

In this case, ladies and gentlemen, the [g]overnment will prove to you beyond a reasonable doubt that it was Deadeye Rick, the defendant before you today, who was giving the orders on January 15, 1997, who was giving the directions, *and who was driving the car that was waiting just a short distance away when Darryl Hall was kidnapped.*

\* \* \*

That afternoon they drove up—this man, Dante Boyd, drove up approximately lunchtime, 12:00 o'clock. He was there with Corey. They wanted to confirm, to make sure, that Angelo and Darryl were, in fact, in school that day, and once they were satisfied that they were, they left and returned about 3:30, shortly before school let[ ] out. *Dante was driving. He was driving the same car at 3:30 that he was seen driving at 12:00 o'clock.* He parked in an alley, and Dante, along with Corey, Craig and Tweety, sat and lied in wait for Darryl and D'Angelo, and when Darryl and D'Angelo walked home in the same path they always took, that is when they acted.

Now, the evidence will show that *after kidnapping Darryl, Dante drove the car,* so there were a total of five people, the three individuals whose photograph you see here, Dante Boyd and Darryl Hall in that car. They drove to the Circle. Jovan James went into his house or into an apartment and got a gun, another gun, because they were already armed. He got a Mac 11. They drove—*Dante Boyd drove the car to an area of Burns and Ridge Road, a short distance away,* and then this man Dante Boyd and Jovan James took [l]ittle Darryl into the woods, and Dante Boyd gave the instructions and the orders to Jovan James to kill Darryl. That is exactly what Jovan James did. It was Jovan

James that fired the shots that killed ... Darryl.

(Emphasis added.) It is surely inconceivable that the prosecutor failed to recognize the contradiction between this opening and "the whole truth" that he had described to the jury at the Watson trial three months earlier, for the two versions posited a different driver. The prosecutor thus gave irreconcilable accounts to the two juries that considered the murder of Darryl Hall and the other crimes related to that murder.

PDS suggests, not altogether implausibly, that this marked switch in factual theories reflected the government's available evidence against Boyd, rather than a sudden discovery that the theory of the case that the prosecutor had repeatedly embraced as the truth at Watson's trial was no longer convincing. There were no significant new developments between the two trials. Boyd had made no statement when he was arrested. Watson and James, who had already been convicted and sentenced, and who could have been called as prosecution witnesses, were unlikely to help the government's case against Boyd, for each of them had, at some point, represented that only three men—Shaw, Watson, and James—were involved in the planning and execution of the offenses, and that Boyd had nothing to do with the kidnapping or the murder. Indeed, the prosecutor had no reason to suppose that, if called to testify, any of the other defendants would inculpate Boyd, and none of the three was called as a government witness. D'Angelo Hall, who had been a prosecution witness in the Watson trial, also testified against Boyd, and he stated that Boyd was on the scene "like telling them to come on" during the abduction. Arguably, however, D'Angelo's credibility was substantially compromised by inconsistent statements that he had made

to the police.[9] In order to beef up his case against Boyd, the prosecutor had to rely on new witnesses whose testimony was not required in the far simpler case against Boyd's former codefendant, Watson.

Specifically, at Boyd's trial, the government presented the testimony of Juanita Allen, a schoolmate and close friend of Darryl, who was thirteen years old at the time of Darryl's murder. Although she had previously been interviewed by the police, Juanita was not a witness at Watson's trial. Juanita testified that Boyd drove to the school in a brown station wagon during the lunch break on the day of the murder and that he seemed to be asking his sister, Antee Boyd, some questions. Later, after classes had ended, Juanita saw Jovan James and Corey Shaw struggling with Darryl, and the two men placed him in the same station wagon, which at that time was parked in an alley. According to Juanita, Boyd was again in the driver's seat,[10] and she saw Watson in the vicinity of the car. Juanita's friend, Niha Odumn, corroborated Juanita's testimony in part; she testified that she saw Boyd in the brown station wagon, talking to his sister, during the lunch recess, and that she saw James and Shaw outside the car with Darryl later that afternoon. Niha was unable, however, to identify the driver of the station wagon when she saw it for the second time.

The government also called Kenneth Bass–Bey, a jailhouse informant or "snitch," who testified that Boyd had admitted to Bass–Bey that he (Boyd) was involved in the murder. According to Bass–Bey, Boyd acknowledged that he was driving the car during the incident.[11] Apparently on the basis of Juanita's testimo-

---

9. D'Angelo originally told the police that he was only 80% sure that Boyd was involved, a percentage he later increased to 100%. He first reported that he had seen three people put Darryl into the car. D'Angelo subsequently testified, however, that he never saw Darryl placed into the car at all. D'Angelo also told the police that he never saw the face of the "third man," whom he identified as Boyd, and that he never heard what the man said. D'Angelo stated that he had identified the man as Boyd because he thought that Boyd was the guy who *would* be telling the others what to do. When questioned regarding his initial uncertainty about his identification, D'Angelo stated that he had told the officers that he was only 80% certain that Boyd was involved in the hope that the police would not lock Boyd up, so that he (D'Angelo) could "get him" himself. D'Angelo was unable to state why, given his desire to impose "street justice," he identified James to the police without hesitation.

10. Juanita acknowledged that when she saw a man (whom she identified as Boyd) in the driver's seat of the station wagon, the vehicle was in the alley with its rear towards her. She claimed that she could identify Boyd be-cause he turned his head and she was able to see the side of his face. Juanita was also significantly impeached with a prior inconsistent signed statement to the police, and she asserted on the witness stand that the prior statement was incorrect in several respects.

11. A second jailhouse informant, John McClam, also testified that Boyd had implicitly confessed his involvement. According to McClam, however, Boyd stated that he was *not* in the car during the abduction, but that he had furnished a handgun to a young confederate (presumably James) and that he had told the confederate (Boyd allegedly called him a "young-un") what to do. Boyd's two alleged jailhouse confessions were thus at odds over the key issue as to whether or not Boyd drove the car.

There was considerable controversy during Boyd's trial and on appeal surrounding the testimony of the two informants, especially that of Bass–Bey. The trial judge held that Bass–Bey's testimony was properly admitted over Boyd's objection, and that there was no violation of Boyd's right to counsel. There was ample evidence to support the judge's ruling, and we discern no legal error. See also note 34, *infra*.

ny[12] and Boyd's alleged confession to Bass–Bey, the government now took the position that Boyd, not Watson, was the driver of the car, both during the reconnaissance and at the time of the abduction and murder. The prosecutor never disclosed to the jury that as a representative of the United States, he had quite recently presented, and essentially vouched for the truthfulness of, witnesses who testified that Watson (and not Boyd) was the man who aided and abetted James in the murder by driving James and his confederates to and from the scene.

Boyd presented several alibi witnesses, who testified that they saw Boyd in or near his mother's apartment in the early afternoon of January 15, 1997. Watson, James, D'Angelo Hall and Kirk Proctor[13] testified that only three persons participated in the abduction. Vincent Watson again testified that his brother was driving the car[14] and that Boyd was not involved at all. The prosecutor subjected Vincent to a skeptical and even hostile cross-examination, intimating that Vincent was attempting to protect Boyd because the two men were close friends. Jovan James testified that Boyd played no part in the offense, but he was impeached, *inter alia*, with his contrary admission at his plea proceeding. Boyd also took the stand, and he denied any involvement in the crimes with which he was charged.

The principal defense asserted by Boyd's counsel, in elaboration of a general denial, was that the abduction and murder were committed by three men, not four. This issue was of critical importance, for, as we have seen, three perpetrators— Shaw, Watson, and James—had already been convicted of Darryl's murder and related crimes after pleading guilty (in the cases of Shaw and James) or after substantially admitting guilt (in Watson's case). Thus, if only three men participated in the crime, Boyd could not have been one of them. The defense also pointed out that the prosecution's alleged eye-witnesses—D'Angelo and Juanita—contradicted each other in their accounts of Boyd's whereabouts during the abduction. D'Angelo claimed that Boyd was outside the car, urging on his confederates, while Juanita testified that Boyd was in the driver's seat of the station wagon.[15]

In his rebuttal argument, the prosecutor attempted to address the apparent inconsistencies between the accounts of the two eye-witnesses who placed Boyd at the scene. He told the jury that, under the "aiding and abetting" theory, "it does not matter if Dante Boyd is the driver, the helper in terms of picking up Darryl Hall, or the person waving them to the car." He stated that any one of these actions made Boyd responsible under the law. However, recognizing that the jury might want the evidence to "make sense," the prosecutor guessed that Boyd might have stepped out of the car at some point during the abduction, and that during his tem-

---

12. Although Juanita testified that she saw Boyd drive the station wagon during the noon recess, it is worth noting that she did *not* specifically testify that he drove it during the events related to Darryl's abduction. Juanita did state, however, that she saw Boyd in the driver's seat, and that she then saw the car "drive off."

13. Proctor was a prosecution witness at both trials. He testified that he observed much of the abduction, but that he drove away with his children after being threatened by one of the participants, evidently Watson. Proctor did not identify Boyd.

14. This, of course, was also the government's theory at the Watson trial.

15. As previously noted, both D'Angelo and Juanita also made statements to the police substantially at variance with their trial testimony.

porary absence from the vehicle, he could have shouted orders to his confederates (as D'Angelo claimed he did). If that was what occurred, then Juanita could still have seen Boyd in the driver's seat. In speculating in this manner, the prosecutor did not say a word about the theory on which Watson had been convicted, namely, that Watson, not Boyd, was the driver. So far as we can discern from the record, the jurors in Boyd's case were never made aware, by either party or by the judge, that the theory that Boyd drove the station wagon was significantly at odds with the government's presentation against Watson.

Early in Boyd's trial, defense counsel reiterated a previous *Brady* request for disclosure of the statements of any witness who had observed the abduction and had seen only three or fewer participants. The prosecutor acknowledged the existence of three such statements,[16] but he refused to disclose them to the defense, claiming that they were not exculpatory or material. The trial judge agreed with the prosecutor, and she declined to examine the statements *in camera.*

The jury convicted Boyd of all charges that were submitted to it. Boyd noted a timely appeal.[17]

### D.   *The appeals.*

The appeals of Watson and Boyd were consolidated, and the government filed a single brief addressing both appeals. Because Watson's argument on appeal focused almost entirely on the amount of victim compensation funds that he could be required to pay,[18] and because Boyd raised numerous issues in support of his direct and collateral appeals, the government focused its brief primarily on Boyd's appeal.

In its original brief to this court, the government repeatedly reiterated that Boyd was the driver of the station wagon. The government argued, for example, that "even if Boyd did not personally chase, assault, or pursue D'Angelo Hall ... he was liable as an aider and abettor because he drove the station wagon during the kidnapping." (Citations and internal quotation marks omitted.). There was no suggestion or acknowledgment in the government's brief that the prosecutor had previously given an opening statement at the Watson trial that was inconsistent with this theory. Rather, the government implied that it had taken the same position at both trials, stating in its brief that "[t]he government's evidence at Watson's trial was similar to that presented at Boyd's trial, except that the government also introduced Watson's confessions to the police and testimony before the grand jury." In its brief, the government did not call attention to the fact that at Watson's trial, the prosecutor had relied pri-

---

16.  Subsequently, in a post-argument supplemental submission, the government revealed that it had two more such statements, the existence of which was never disclosed to the trial court. See p. 54, *infra.*

17.  Following his conviction, Boyd filed a motion to vacate his sentence pursuant to D.C.Code § 23–110 (2001), alleging constitutionally ineffective representation by trial counsel. Boyd did not include in his motion any claim based on the change in the government's theory with regard to the identity of the driver of the station wagon during the abduction. The trial judge denied the motion, and Boyd appealed (No. 00–CO–558). We agree with the trial judge that Boyd established neither deficient performance nor prejudice, as defined in *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).

18.  Watson's convictions were affirmed by unpublished Memorandum Opinion and Judgment on August 9, 2005. *See Watson v. United States,* Nos. 98–CF–457, 01–CO–421, 02–CO–835, and 04–CO–852 (D.C.2005).

marily on the statements of Watson and James, while at Boyd's trial, he based his case, in substantial part, on the testimony of Juanita Allen, Niha Odumn, and the two jailhouse informants, none of whom had testified against Watson.[19] At the initial oral argument on May 10, 2005, counsel for the government, notwithstanding several skeptical questions from the bench, did not disclose that the government had taken significantly different positions at the two trials, although counsel did offer to look into the issue and provide supplemental information if the court wished him to do so.

On August 9, 2005, the court issued a supplemental order directing the parties, and inviting PDS, to file supplemental submissions regarding the legal significance of the inconsistent positions taken by the government, the applicability of the *Brady* doctrine, and the government's compliance *vel non* with its obligation of candor to the court. Extensive and helpful supplemental briefs were filed and, following a sec-

ond oral argument, the case is ripe for decision.

## E. *Legal analysis.*

### (1) *The standard of review.*

The government contends that because Boyd did not claim in the trial court that the government's change in its factual theory denied him liberty without due process of law, this court should now confine its consideration of the issue, at most, to a determination whether the trial court committed plain error.[20] The government argues:

> Boyd's attorney acknowledged that he had access to the transcripts from Watson's case.[21] Vincent Watson also appeared as a defense witness in Boyd's trial and testified, as he did at Craig Watson's trial, that Craig Watson drove the station wagon. Yet, despite having access to the transcripts and despite having an incentive to ferret out evi-

---

**19.** In a footnote to its supplemental brief, the government appropriately catalogued the facts that it should have disclosed with greater clarity in its initial brief:

> To be completely precise, the brief should have noted that Juanita Allen and Niha Odumn did not testify for the government at Watson's trial, but did testify at Boyd's trial. Moreover, in its case-in-chief in Watson's trial, the government played a tape of Jovan James's confession to the police, whereas it did not introduce this tape in its case-in-chief in Boyd's trial. Instead, Boyd called Jovan James as a defense witness. Furthermore, in its case-in-chief in Boyd's trial, the government called two jailhouse witnesses, Kenneth Bass–Bey and John McClam, who related incriminating statements made to them by appellant Boyd; these witnesses were not called in co-defendant's Watson's trial.

Indeed, the government should have so noted even if "complete precis[ion]" is not required. But even more importantly, the government attorneys handling such significant murder cases and appeals should have known, and

they had a duty to reveal, that the prosecutor gave the two juries patently inconsistent accounts. We should note, however, that although Boyd's counsel had raised numerous issues on appeal, she had made no mention of the difference between the prosecution's theories on which Watson and Boyd were tried.

**20.** The government first urges that we should not consider the issue at all. In light of the fact that the court asked for supplemental briefing on this very point, this suggestion by the government does not present a very promising scenario.

**21.** This statement is correct. Indeed, defense counsel described to the judge in some detail, on the basis of the transcripts of the Watson trial, the testimony that four witnesses at that trial could be expected to give if they were called to testify at Boyd's trial. We have no doubt that the defense had access, in the trial court, to the information on which the "change in prosecution theory" due process claim, made for the first time on appeal, is based.

dence to support his claim that Craig Watson drove the car, Boyd did not assert any due-process or estoppel claim arising from the government's litigation position. Rather, Boyd recognized that, as in many co-defendant murder cases, there were varying accounts of the crime and contradictory statements from the perpetrators themselves.... [A]t sentencing, defense counsel acknowledged that the government had not articulated a single theory regarding Boyd's particular role and agreed that the "most logical [government] theory," based upon Juanita Allen's testimony, was that Boyd drove the car.

Further, according to the government, Boyd's attorney "must have known that the government had argued in that prior proceeding that Craig Watson drove the car," and the record bears out this observation. If defense counsel had presented to the trial court the claim of an unconstitutional change in core factual theories, the government would have had an opportunity to explain the reasons for altering its position, and the judge would also have had an enhanced opportunity to take corrective action in the trial court. Specifically, the judge could have required disclosure to the Boyd jury of the position that the prosecution had taken in Watson's trial.

Moreover, Boyd's appellate counsel likewise did not address this issue until after the court had raised it in its supplemental order of August 9, 2005. Indeed, although, as we have noted, Boyd's attorney filed a motion to vacate Boyd's sentence pursuant to D.C.Code § 23–110 for ineffective assistance of counsel, trial counsel's failure to raise in the trial court the government's change of factual theory was not among the grounds asserted in support of the motion.

The position that the constitutional claim presently under discussion has been preserved is stated in PDS' amicus brief as follows:

This [c]ourt should ... reject the notion that the due process claim should be subject to plain error review. Whether or not Boyd's trial counsel ordered some portion of the transcripts of the Watson trial for use in preparing for trial, it was *the government* who was the repeat player at the two trials at issue and it was *the government's* responsibility to conduct its prosecutions in consonance with the due process clause. Under these circumstances, application of waiver or plain error review would be inappropriate.

(Footnote omitted.)

The identification of the appropriate standard of review appears to raise a question of first impression in this jurisdiction. The prosecutor, having been a participant in both trials, was in a superior position to know of the change in the government's theory, and we think that he was remiss in not disclosing to the jury in the Boyd case the position that the government had taken during the prosecution of Watson. Indeed, the government all but acknowledges as much. See p. 51, *infra*. On the other hand, neither Boyd nor PDS has cited any authority—and we know of none—for the proposition that where, as here, defense counsel has had the opportunity to raise an issue in the trial court but has failed to do so—and in this case, she has not raised it even on appeal, although the court has done so—the point should nevertheless be treated as if it had been preserved. Two cases cited by the government suggest that a plain error standard may be appropriate, but neither is squarely in point.[22]

---

22. In *State v. Flowers*, 347 N.C. 1, 489 S.E.2d 391 (1997), a case similar to this one, the

Given the lack of any controlling or clearly analogous authority, the question whether our review should be for plain error, as the government contends, is not an easy one. We conclude, however, that we need not resolve this issue, for even if we treat the due process claim based on inconsistent theories of prosecution as having been preserved, we do not find it persuasive on the merits.

### (2) The merits.

■ This court has recently had occasion to recognize the existence of a growing body of law which stands for the general proposition that "where multiple defendants are tried separately, the due process clause is violated where the prosecution presents inconsistent theories at their trials." *Hammond v. United States,* 880 A.2d 1066, 1105 (D.C.2005); *see also Smith v. Groose,* 205 F.3d 1045 (8th Cir.2000); *Thompson v. Calderon,* 120 F.3d 1045 (9th Cir.1997) (en banc) (plurality opinion), *rev'd on other grounds,* 523 U.S. 538, 118 S.Ct. 1489,

140 L.Ed.2d 728 (1998); *Stumpf v. Mitchell,* 367 F.3d 594, 611–12 (6th Cir. 2004), *vacated in part sub nom. Bradshaw v. Stumpf,* 545 U.S. 175, 125 S.Ct. 2398, 162 L.Ed.2d 143 (2005); *In re Sakarias,* 35 Cal.4th 140, 25 Cal.Rptr.3d 265, 106 P.3d 931 (2005), *cert. denied sub nom. Waidla v. California,* —— U.S. ——, 126 S.Ct. 430, 163 L.Ed.2d 327 (2005); *but cf. United States v. Urso,* 369 F.Supp.2d 254, 263–64 (E.D.N.Y. 2005), and authorities cited in *Urso.* The government does not dispute this proposition, and acknowledges that "[i]n some circumstances, it may offend due-process principles for the government to present inconsistent factual theories in successive trials involving co-defendants charged with the same crime." The government cautions, however, and we agree, that

> the presence of factual inconsistency, without more, will not give rise to a due-process violation. Rather, at a minimum, "[t]o violate due process, an inconsistency must exist at the core of the prosecutor's cases against the two defen-

---

appellant, Flowers, asserted that the trial court erred by failing to prevent the prosecution from changing its prior theory of guilt when it sought his conviction. Flowers claimed that at the earlier trial of his codefendants, the State had taken the position that Flowers was merely a lookout, while at Flowers' trial, the prosecutor argued that Flowers also participated in the stabbing that resulted in the decedent's death. The court implied that there was no error in the trial judge's failure to intervene, *see Irick v. United States,* 565 A.2d 26, 33 (D.C.1989), when the defense failed to object:

> We note for purposes of our review that the defendant failed to object to the prosecutor's argument in this regard. When no objections are made at trial, the prosecutor's argument is subject to limited appellate review for gross improprieties.

*Id.* at 401 (citations omitted). The court went on to explain, however, that "the State's evidence was essentially the same in both trials—that all four defendants were equally cul-

pable." *Id.* Presumably, in stating that "the prosecutor's argument is subject to limited appellate review," the court meant to say that *the judge's ruling* (or failure to intervene) was subject to such review. *Irick,* 565 A.2d at 33.

In *United States v. Paul,* 217 F.3d 989 (8th Cir.2000), the defendant claimed that he had been denied due process because the prosecution had asserted, against him, a factual theory and argument different from the presentation made by the United States at a codefendant's trial. In rejecting the defendant's contention, the court stated: "[T]he government points out that there was no objection to this argument at trial and that review is for plain error." *Id.* at 998. Although the court discerned no error at all, the use of the words "points out" suggests that the court may have agreed with the government's contention. For a court to state that a party "points out" that something is so differs from a statement that the party "claims" that it is so; the first phrase arguably connotes agreement, the second does not.

dants for the same crime," and the inconsistency "must have rendered unreliable" the resulting conviction. *Clay v. Bowersox,* 367 F.3d 993, 1004 (8th Cir. 2004) (internal citation and quotation omitted).

*Accord, [Erika] Sifrit v. State,* 383 Md. 77, 857 A.2d 65, 78–82 (2004) (discussing and analyzing federal precedents); *[Benjamin] Sifrit v. State,* 383 Md. 116, 857 A.2d 88, 91 (2004) ("A due process violation does not exist in a situation involving multiple trials based upon a single crime transaction, unless the prosecutor presents inconsistent theories *and the inconsistency exists at the core, not the margins,* of the ... State's case.") (Emphasis added.)

In the present case, we cannot conclude that the inconsistency between the government's presentations at the trials of Watson and Boyd exists "at the core" of the prosecution's case. While proceeding against Watson, the government sought to prove that Shaw, James, Watson, and Boyd conspired to abduct and kill the Hall brothers, that the first three men named above succeeded in capturing Darryl, that Boyd, meanwhile, stayed in the car, that Watson drove the other participants to and from the murder scene, and that James shot Darryl to death. At Boyd's trial, the prosecutor sought to show the same conspiracy, abduction, and murder, but he and some of his witnesses placed Boyd, not Watson, at the wheel of the station wagon.

The identity of the driver does not go to the core of the government's theory. If the government's evidence is credited, then Boyd participated in these crimes even if Watson drove the car, and Watson participated even if Boyd was at the wheel.

The inconsistency thus lacks the centrality that would bring this case within this category of due process violations based on prosecutorial changes of theory. Moreover, since the government claimed at Watson's trial that Boyd was in the car alone during the abduction, and in light of the evidence that Boyd drove the station wagon during the alleged noon reconnaissance mission, the notion that a witness (*i.e.,* Juanita) might think that he was in the driver's seat is understandable, even if he was in fact elsewhere in the car. This is particularly so since, according to her testimony, Juanita saw the station wagon in the alley only briefly and was looking at the car from the rear.

Boyd and PDS argue, however, that, at Boyd's trial, the prosecutor failed to carry out his obligations as set forth in *Napue v. Illinois,* 360 U.S. 264, 269, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959),[23] when he did not bring to the attention of the jury the testimony and, indeed, his own representations at Watson's trial that were contrary to the theory that the government was asserting against Boyd. PDS phrases the argument as follows in its brief:

> As the government approached Boyd's trial, it thus had a significant problem. As opposed to the evidence it had against the three codefendants who had confessed to the police, the government's evidence of Boyd's involvement in the crime was relatively thin. Furthermore, two of its most critical witnesses against Boyd—Juanita Allen and Kenneth Bass–Bey—placed Boyd in the driver's seat of the car that the government had every reason to believe was driven by Watson. The government thus had two choices as it proceeded to

---

**23.** The Supreme Court held in *Napue* that a conviction obtained by the prosecutor's knowing use of false evidence, or by his allowing false testimony to go uncorrected, denies the defendant liberty without due process of law. *Id.* at 269, 79 S.Ct. 1173. Although the prosecutor's actions in this case are troubling, Boyd has not shown, in our view, that the prosecutor intentionally failed to correct testimony that he *knew* to be false.

Boyd's trial that would have given proper protection to Boyd's due process rights: it could have tried Boyd without the testimony of Juanita Allen and Kenneth Bass–Bey, or it could have presented the testimony of these two witnesses and taken affirmative steps to inform the jury that, in the government's eyes, that portion of their testimony that placed Boyd in the driver's seat of the station wagon was untrue. The government could not, however, consistent with the due process clause, do what it did: convict Boyd based upon a theory and evidence that was inconsistent with the theory and evidence it had presented to a jury three months prior, particularly when it believed that the evidence it relied upon in the Watson trial was the truth.

The government acknowledges that at least a part of PDS' point is not so very wide of the mark. It states in its brief that although Boyd's due process rights were not violated, "we acknowledge that there may be an appearance of unfair dealing when a prosecutor argues inconsistent evidentiary theories at separate trials for the same criminal offense." The government continues in the same vein:

> In some circumstances, such a change in theories may be justified, for example, by a shift in the evidence in the government's possession between the two trials. In general, however, when the evidence on an important factual point is conflicting, *the government appropriately either should adopt a consistent theory in both trials or acknowledge the factual conflict and make clear to the jury that it is unclear which version of the facts is correct, but that the defendant on trial is guilty either way.*

(Emphasis added.) After a somewhat labored (and, in our view, not at all persuasive) explanation of circumstances that supposedly warranted a departure from what it admits to be the usually appropriate course of action,[24] the government assures us that "[t]his unusual confluence of events is not likely to recur, and we do not expect the issue presented by this case to recur either." This is a welcome assurance.

Boyd and PDS assert that Boyd suffered prejudice when the jurors were told by the prosecutor that Boyd was in the driver's seat or driving the car, without any acknowledgment that this testimony was contrary to the factual theory that the government had presented to another jury to obtain Watson's conviction. They contend that if Boyd's jury had believed what the government persuaded Watson's jury to believe, it would arguably have had to conclude (1) that Juanita was lying or mistaken when she testified that she saw Boyd in the driver's seat, and (2) that Bass–Bey was lying or mistaken when he testified that Boyd *admitted* driving the car. Perhaps, counsel suggest, the jurors would not have believed these witnesses' testimony at all, and the evidence that Boyd was present at the time of the abduc-

---

24. The government stated:

This was an unusual case, though. Here, various defendants made conflicting incriminating statements as to their roles in the conspiracy. The difficulty in uncovering the truth was further exacerbated, at least in the government's view, by the fact that one or more of the defendants may have had an incentive to enhance his own culpability in order to protect others who were involved in the crime.

Although this passage may (or may not) explain the government's different impressions of the facts at different times, it provides no justification whatever for not "acknowledg[ing] the factual conflict" and not revealing at Boyd's trial that its representations were significantly at variance from those that the same prosecutor had made at Watson's trial.

tion and that he participated in the kidnapping and murder would have been substantially weaker.

■ The jurors might, on the other hand, have credited Juanita's testimony, partially corroborated by Niha Odumn, that Boyd was in the car at the time of the kidnapping, while still believing that Watson, not Boyd, did the driving. In any event, the transcript of Watson's trial was available to Boyd's defense attorney. The contrast between the presentations at the two trials was there for the defense to exploit if it chose to do so. This is therefore not a case like *Napue*,[25] in which "the prosecutor knew that the evidence was false, but the judge and defense counsel did not." *Bruce v. United States*, 617 A.2d 986, 993 (D.C.1992). The judge presumably—indeed, actually—knew that Boyd's attorney had access to the transcript. Under these circumstances, and notwithstanding our stated disapproval of the prosecutor's silence during the Boyd trial regarding the government's representations and evidence at the Watson trial,[26] we discern no reversible error. But even as we so hold, we conclude our discussion of this aspect of the case by reminding the government that its "fundamental interest in criminal prosecution [is] not that it shall win a case, but that justice shall be done." *Smith v. Groose*, 205 F.3d at 1049 (quoting *Berger v. United States*, 295 U.S. 78, 88, 55 S.Ct. 629, 79 L.Ed. 1314 (1935)).

## II.

### THE BRADY CLAIM

A. *The statements of which Boyd seeks disclosure.*

■ The defense in Dante Boyd's case, bolstered by alibi testimony, was that three people committed the kidnapping and murder, that their identities are known—they were Shaw, Watson, and James—and that Boyd therefore was not and could not have been a participant. The government's theory was that four men—including Boyd—were involved. "Three versus four" was thus the theme of the defense opening, and it remained the critical issue throughout the trial. As Boyd's counsel asked rhetorically in his closing argument: "Now, three or four? Which was it?"

During the trial, Boyd's attorney reiterated a specific *Brady* request for disclosure of "the existence and identity of witnesses who saw three persons or [fewer] physically abduct Darryl Hall." Counsel indicated that he knew that D'Angelo Hall, Kirk Proctor, Craig Watson, and Jovan James fell into this category; he argued that he was entitled to know "the existence of any other eyewitnesses who saw three or less persons commit the abduction." The prosecutor opposed the request, explaining that he "[did]n't see how that is *Brady* evidence." The prosecutor revealed that he was aware of three witnesses who saw three or fewer men abduct Darryl, but he asserted that "these other people were not *necessarily* in a position to see all four people." (Emphasis added.)

The trial judge commented that "[t]he government's theory is not that there were four people standing closely together in the same position [at the same time] to be seen by anybody who was watching," and the prosecutor agreed. In fact, this description of the prosecution's theory proved to be inaccurate. Juanita Allen

---

**25.** 360 U.S. at 269, 79 S.Ct. 1173.

**26.** Given the stark contrast between the prosecutor's opening statements in the two cases, it would not have been inappropriate for the judge, *sua sponte,* to call counsel to the bench and to request an explanation.

and Niha Odumn both subsequently testified that they saw four young men close together at the time Darryl was forced into the car in the alley. The trial judge was probably unaware of Juanita and Niha, neither of whom had been a witness at Watson's trial, but the prosecutor knew (or at least should have known) of the girls' anticipated testimony. Nevertheless, the prosecutor resisted the *Brady* demand on the basis of a theory that proved incompatible with the evidence which the government later introduced.

The trial judge denied the *Brady* request without conducting an *in camera* review of the statements which the prosecutor had described. The judge reasoned that "given the government's theory as to how this went down, the fourth person would not have been in a position to be seen by everyone who was out there looking at one portion, so that there is nothing *Brady* about the fact that some people saw parts of the incident and other people saw more of it or other parts." The trial judge made no inquiry of the prosecutor regarding which "part" of the incident any of these three witnesses claimed to have seen, or the location of any witness when he or she saw it. Boyd contends that the statements should have been produced pursuant to *Brady*, and that his conviction should therefore be reversed. PDS supports Boyd's position.[27]

The government's evidence at trial established that Darryl Hall was seized on the *street*, and that he was then dragged behind a building to a car which was parked in the alley. The witnesses who described the events *in the alley* testified that they observed four men, in addition to Darryl. Thus, if the government had information from witnesses who saw fewer than four people with Darryl *in the alley*, that information contradicted the government's case with respect to a key material issue and, in our view, constituted *Brady* material.

The government has now revealed in its Supplemental Brief that "[o]ne of the undisclosed witnesses stated that Darryl Hall was thrown into the station wagon by one masked man." We shall refer to this witness as Witness No. 1 and to the other witnesses as Nos. 2 and 3. According to the government, it was not required to provide Boyd's attorney with the statement of Witness No. 1, for it would have been "unhelpful to Boyd's defense." This is so, says the government, because the testimony of Witness No. 1 would have contradicted the "undisputed fact" that at least three persons "participated in the kidnapping."

According to PDS, however, the government "paints with far too broad a brush when it asserts that the issue is merely how many people 'participated' in the 'kidnapping,'" and we agree that a little more precision in analysis is called for. Juanita Allen and Niha Odumn both testified that they saw the kidnappers put Darryl Hall into the car in the alley, and that *two men pushed him in.* Jovan James, on the other hand, testified as a defense witness that only three young men were involved in the kidnapping altogether, and that one—Corey Shaw—was outside the car, pushing Darryl into the vehicle. Under these circumstances, it might well have been very helpful to the defense if Boyd's attorney could have presented testimony (consistent with that of James and contrary to that of

27. In its post-argument order directing supplemental briefing this court also asked the parties to comment on whether it would "at least arguably be material" if "one or more of the undisclosed witnesses observed Darryl in the station wagon with *three* rather than *four* men." (Emphasis in original.)

the two schoolgirls[28]) to the effect that only one person was struggling with Darryl outside the car. If the defense had been able to introduce independent eyewitness testimony suggesting that the girls were mistaken when they testified that four men were at the station wagon when Darryl Hall was placed in it, and corroborating James' testimony to the contrary, the jury might well have viewed differently the decisive issue in the case. Accordingly, on the government's own proffer, the evidence of Witness No. 1 should, at the very least, have been submitted to the trial judge for inspection *in camera*.

The evidence of Witnesses Nos. 2 and 3 is more difficult to assess. The prosecutor asserted in the trial court that none of these witnesses was "in a position to see all four people," and the government adheres to this assertion on appeal. Significantly, however, the prosecutor also agreed with the trial court that "the government's theory is not that there were four people standing closely together in the same position [at the same time] to be seen by anybody who was watching," a representation that puts the government's theory somewhat at odds with the subsequent testimony of Juanita and Niha, who claimed to have seen four men in the alley, in or outside the car. For the reasons that we have described above, the "no witnesses could see all four men" argument did not warrant the withholding of the statement of Witness No. 1, and it is of dubious merit with respect to the other two witnesses. Under these circumstances, and given the concerns discussed in this opinion, we are not persuaded that the issue may properly be resolved by the government's conclusory assertion that the evidence was not subject to production because the witnesses were not in a position to see everything that occurred.

Further, in a footnote to its Supplemental Reply Brief, the government has provided us with an additional reason not to end the inquiry on the basis of the prosecutor's statements at trial:

> In light of amicus's claims, we have again looked at the prosecutor's trial file. In addition to the three witnesses noted by the prosecutor, two other persons appear to have observed the chase in the street. Because these two additional witnesses did not observe the events in the alley where Boyd was located, the prosecutor similarly had no *Brady*-based duty to disclose their names.

Without commenting at this point on the significance or lack thereof of the statements of these witnesses, whom we shall call Nos. 4 and 5, we note that, although counsel for the United States now implicitly acknowledge, by making the disclosure, that the trial judge should have been informed that there were such witnesses (though not of their names), their existence was revealed for the first time in a supplemental reply submission almost *eight years* after Boyd's trial.

B. *The Brady doctrine and materiality.*

In *Brady*, the Supreme Court held that "the government has a constitutional duty to disclose material evidence favorable to a criminal defendant in time for the defendant to make effective use of it at the trial." *Stewart v. United States,* 881 A.2d 1100, 1116 (D.C.2005) (citation and internal quotation marks omitted). Recently, in *Sykes v. United States,* 897 A.2d 769 (D.C.2006), we summarized the *Brady* doctrine as follows:

---

**28.** Juanita and Niha were friends of D'Angelo and Darryl, and the defense challenged their testimony, *inter alia,* on the ground that they failed to report to the police contemporaneously the abduction that they later described at Boyd's trial.

Under *Brady* ... "the suppression by the prosecution of evidence favorable to an accused ... violates due process where the evidence is material either to guilt or punishment, irrespective of the good faith or bad faith of the prosecution." 373 U.S. at 87, 83 S.Ct. 1194. "It is now well settled that the prosecution must disclose exculpatory material at such a time as to allow the defense to use the favorable material effectively in the preparation and presentation of its case...." *Edelen v. United States,* 627 A.2d 968, 970 (D.C.1993) (citation and internal quotation marks omitted). In addition to exculpatory material, "the government is required to disclose evidence ... that affects the credibility of a government witness where material to guilt or punishment." *Ebron v. United States,* 838 A.2d 1140, 1155 (D.C.2003) (citing *Brady, supra,* 373 U.S. at 87, 83 S.Ct. 1194; *Giglio [v. United States,* 405 U.S. 150, 154–55, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972)]); *see also Moore v. United States,* 846 A.2d 302, 305 n. 4 (D.C.2004).... Moreover, " 'a prosecutor's timely disclosure obligation with respect to *Brady* material can never be overemphasized,' and the practice of delayed production must be disapproved and discouraged." *Curry v. United States,* 658 A.2d 193, 197 (D.C.1995) (citation omitted). "Reversal will not be ordered on the grounds of failure to disclose under *Brady* 'absent a further showing that disclosure of the suppressed evidence to competent counsel would have made a different result reasonably probable.' " *Ebron, supra,* 838 A.2d at 1155 (quoting *Farley v. United States,* 694 A.2d 887, 889 (D.C.1997) (quoting *Kyles [v. Whitley,* 514 U.S. 419, 441, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995)])). " 'Reasonable probability,' in this context, means 'a probability sufficient to undermine confidence in the outcome.' " *Id.* (citing *Farley, supra,* (quoting *United States v. Bagley,* 473 U.S. 667, 682, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985)) (other internal quotation marks omitted).

*Id.* at 776–77 (alterations in original and parallel citations omitted).

Since the decision in *Brady,* there has been extensive judicial debate and discussion centering upon *Brady's* "materiality" requirement. We outline below what we understand to be the basic legal principles.

The first major post-*Brady* Supreme Court decision addressing the issue of materiality was *United States v. Agurs,* 427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976), decided thirteen years after *Brady.* In that case, the Court stated:

The problem arises in two principal contexts. First, in advance of trial, and perhaps during the course of trial as well.... Second, after a trial.... *Logically, the same standard must apply at both times.* For unless the omission deprived the defendant of a fair trial, there was no constitutional violation requiring that the verdict be set aside; and absent a constitutional violation, there was no breach of the prosecutor's constitutional duty to disclose.

*Id.* at 107–08, 96 S.Ct. 2392 (emphasis added). The Court explained that a "mere possibility that an item of undisclosed information might have helped the defense, or might have affected the outcome of the trial, does not establish 'materiality' in the constitutional sense." *Id.* at 109–110, 96 S.Ct. 2392. The Court recognized that "the significance of an item of evidence can seldom be predicted accurately until the entire record is complete," and therefore cautioned "the prudent prosecutor" to resolve doubtful questions in favor of disclosure. *Id.* at 108, 96 S.Ct. 2392. Nevertheless, according to the

Court, "the prosecutor will not have violated his *constitutional* duty of disclosure unless his omission is of sufficient significance to result in the denial of the defendant's right to a fair trial." *Id.* (emphasis added).

Nine years later, in *United States v. Bagley*, 473 U.S. 667, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985), the Court, over a powerful dissent by Justice Thurgood Marshall, reiterated that the right established by *Brady* was not all-encompassing. Writing for the majority, Justice Blackmun stated that "[a]n interpretation of *Brady* to create a broad, constitutionally required right of discovery would entirely alter the character and balance of our present systems of criminal justice." *Id.* at 675 n. 7, 105 S.Ct. 3375 (citation and internal quotation marks omitted). A rule requiring the government "to disclose evidence favorable to the accused, no matter how insignificant, would impose an impossible burden on the prosecutor and would undermine the interest in the finality of judgments." *Id.* The Court thus reiterated that the materiality requirement applies at the time of the required disclosure, notwithstanding Justice Marshall's point that the prosecutor cannot know, in advance of trial, and without being apprised of the accused's defense, what will turn out to be material and what will not.[29]

Ten years after *Bagley*, the Court reiterated that "the Constitution is not violated every time the government fails or chooses not to disclose evidence that might prove helpful to the defense." *Kyles*, 514 U.S. at 436–37, 115 S.Ct. 1555. The Court explained that the materiality of undisclosed evidence depends upon whether it "could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *Id.* at 419, 115 S.Ct. 1555. The Court added that the materiality standard "must accordingly be seen as leaving the government with a degree of discretion," and the prosecutor, who "alone can know what is undisclosed, must be assigned the consequent responsibility to gauge the likely net effect of all such evidence and make disclosure when the point of 'reasonable proba-

---

**29.** Writing for himself and Justice Brennan, Justice Marshall opined as follows:

> The standard for disclosure that the Court articulates today enables prosecutors to avoid disclosing obviously exculpatory evidence while acting well within the bounds of their constitutional obligation.... The result is to veer sharply away from the basic notion that the fairness of a trial increases with the amount of existing favorable evidence to which the defendant has access, and to disavow the ideal of full disclosure.
>
> The Court's definition poses other, serious problems. Besides legitimizing the nondisclosure of clearly favorable evidence, the standard set out by the Court also asks the prosecutor to predict what effect various pieces of evidence will have on the trial. He must evaluate his case and the case of the defendant—of which he presumably knows very little—and perform the impossible task of deciding whether a certain piece

> of information will have a significant impact on the trial, bearing in mind that a *defendant* will later shoulder the heavy burden of proving how it would have affected the outcome. At best, this standard places on the prosecutor a responsibility to speculate, at times without foundation, since the *prosecutor will not normally know what* strategy the defense will pursue or what evidence the defense will find useful. At worst, the standard invites a prosecutor, whose interests are conflicting, to gamble, *to play the odds, and to take a chance that* evidence will later turn out not to have been potentially dispositive.
>
> * * *
>
> I simply cannot agree with the Court that *the due process right to favorable evidence* recognized in *Brady* was intended to become entangled in prosecutorial determinations of the likelihood that particular information would affect the outcome of trial.

473 U.S. at 700–02, 105 S.Ct. 3375.

bility' is reached." *Id.* at 437, 115 S.Ct. 1555.

The government attributes to PDS (but not to Boyd), and PDS does not disclaim, the position that the United States is obliged under *Brady* to turn over to the defense any information that is potentially exculpatory, regardless of whether it would ultimately have affected the outcome of the trial.[30] Whatever appeal such a position may have to judges of some other courts, this court is precluded by the Supreme Court's strictures in *Agurs, Bagley,* and *Kyles* from adopting it, at least in the form articulated above.

This, however, does not end the inquiry. A little common sense is in order, and the courts have so recognized. "No one has [the] gift of prophecy." *Lewis v. United States,* 408 A.2d 303, 307 (D.C.1979). "The government is not in a position to be a perfect arbiter of defense strategy." *Id.* at 309. Although we are required to leave the prosecutor "with a degree of discretion" in identifying information that must be turned over to the defendant pursuant to *Brady, Kyles,* 514 U.S. at 437, 115 S.Ct. 1555, that discretion is not unlimited, and courts have the obligation to assure that it is exercised in a manner consistent with the right of the accused to a fair trial.

This brings us to the Supreme Court's most recent decision which significantly addresses the issue of materiality. In *Strickler v. Greene,* 527 U.S. 263, 119 S.Ct. 1936, 144 L.Ed.2d 286 (1999), an opinion written by Justice Stevens, the Court described the government's *Brady* obligation in terms of the special status of the American prosecutor. The Court stated that the *Brady* line of cases,

> together with earlier cases condemning the knowing use of perjured testimony, illustrate the special role played by the American prosecutor in the search for truth in criminal trials. Within the federal system, for example, we have said that the United States Attorney is "the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that is shall win a case, but that justice shall be done."

*Id.* at 281, 119 S.Ct. 1936 (quoting *Berger,* 295 U.S. at 88, 55 S.Ct. 629). The Court went on to explain that "[t]his special status explains both the basis for the prosecution's broad duty of disclosure and our conclusion that *not every violation of that duty necessarily establishes that the outcome was unjust.* . . . [S]trictly speaking, there is never a real '*Brady* violation' unless the nondisclosure was so serious that there is a reasonable probability that the suppressed evidence would have produced a different verdict." *Strickler,* 527 U.S. at 281, 119 S.Ct. 1936 (emphasis added). As the italicized language demonstrates, the

---

**30.** PDS cites the District's Rules of Professional Conduct, which require the prosecutor to

> disclose to the defense, upon request and at a time when use by the defense is reasonably feasible, any evidence or information that the prosecutor knows or reasonably should know tends to negate the guilt of the accused or to mitigate the offense . . . except when the prosecutor is relieved of this responsibility by a protective order of the tribunal.

D.C. Bar R. 3.8(e) (2006) (special responsibilities of a prosecutor). By its terms, Rule 3.8(e) is not conditioned on the materiality of the information. However, the Commentary to the Rule, not addressed in PDS' brief, states that this Rule "is not intended either to restrict or to expand the obligations of prosecutors derived from the United States Constitution, federal or District of Columbia statutes, and court rules of procedure."

Supreme Court in *Strickler* contemplated the existence of a broad "duty of disclosure," but recognized that, when the government fails to carry out its duty, its noncompliance with that obligation will only rise to the level of a constitutional violation if materiality is subsequently established.[31] The Court thus recognized that a duty of disclosure exists even when the items disclosed later prove not to be material.

The decisions of the various courts construing the Supreme Court's precedents discussed above cannot be fully harmonized. *Compare United States v. Safavian,* 233 F.R.D. 12 (D.D.C.2005),[32] *and United*

**31.** In its brief, the government rejects this reading of *Strickler:*

> In the opening paragraphs of the opinion, *Strickler* describes the "broad duty of disclosure" with respect to evidence "favorable to the accused" that is "material to guilt or to punishment." *Id.* at 280, 119 S.Ct. 1936 (citing *Brady v. Maryland,* 373 U.S. 83, 87, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963)). The duty to disclose "such evidence" is "broad" because this duty applies regardless of whether the prosecutor acts in good or bad faith and regardless of whether the defense requests the evidence. *Id.* Moreover, the duty is "broad" because it requires prosecutors to make inquiry of all government agents working on the case. *Id.*

The government's argument does not explain the phrase that we have italicized, which can fairly be read only as recognizing that a duty of disclosure exists even if it later appears that reversal is not required. There is no other reasonable way to read the Court's language.

**32.** In *Safavian,* Judge Paul L. Friedman expressed the view, a persuasive one in our opinion, that the materiality requirement should not apply at the time that the prosecutor is evaluating evidence before or during trial:

> [The government] contends that evidence is "material" only "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different" (quoting *Strickler v. Greene,* 527 U.S. [at] 280, 119 S.Ct. 1936). ... The problem with this iteration of *Brady* and the government's view of its obligations at this stage of the proceedings, however, is that it permits prosecutors to withhold admittedly favorable evidence whenever the prosecutors, in their wisdom, conclude that it would not make a difference to the outcome of the trial. Most prosecutors are neither neutral (nor should they be) nor prescient, and any such judgment necessarily is speculative on so many matters that simply are unknown and unknowable before trial begins: which government witnesses will be available for trial, how they will testify and be evaluated by the jury, which objections to testimony and evidence the trial judge will sustain and which he will overrule, what the nature of the defense will be, what witnesses and evidence will support that defense, what instructions the [c]ourt ultimately will give, what questions the jury may pose during deliberations (and how they may be answered), and whether the jury finds guilt on all counts or only on some (and which ones).
>
> The prosecutor cannot be permitted to look at the case pretrial through the end of the telescope an appellate court would use post-trial. Thus, the government must always produce any potentially exculpatory or otherwise favorable evidence without regard to how the withholding of such evidence might be viewed—with the benefit of hindsight—as affecting the outcome of the trial. The question before trial is not whether the government thinks that disclosure of the information or evidence it is considering withholding might change the outcome of the trial going forward, but whether the evidence is favorable and therefore must be disclosed. Because the definition of "materiality" discussed in *Strickler* and other appellate cases is a standard articulated in the post-conviction context for appellate review, it is not the appropriate one for prosecutors to apply during the pretrial discovery phase. The only question before (and even during) trial is whether the evidence at issue may be "favorable to the accused"; if so, it must be disclosed without regard to whether the failure to disclose it likely would affect the outcome of the upcoming trial.

233 F.R.D. at 16.

*States v. Sudikoff,* 36 F.Supp.2d 1196, 1199 (C.D.Cal.1999) (government has a broad pretrial duty of disclosure of exculpatory information irrespective of the prosecutor's view of the ultimate materiality of the evidence), *with United States v. Causey,* 356 F.Supp.2d 681, 696 (S.D.Tex.2005) (declining to follow *Sudikoff*). Although *Safavian* and *Sudikoff* go further than we are prepared to venture, there is other post-*Strickler* authority also clearly differentiating between the duty of disclosure and materiality. In *Monroe v. Angelone,* 323 F.3d 286 (4th Cir.2003), for example, one issue was whether the prosecutor was required to reveal information that he viewed as redundant. The Court of Appeals held that

> the prosecution has a duty to disclose material even if it may seem redundant. *Redundancy may be factored into the materiality analysis, but it does not excuse disclosure obligations.*

*Id.* at 301 (emphasis added). Moreover, "[a]n important consideration here is that, under *Kyles,* [514 U.S. at 436, 115 S.Ct. 1555], the question of materiality must be considered collectively, not item by item." *Id.* at 302 (internal quotation marks omitted).

To derive a consistent rule from the foregoing rough synopsis of the case law is not easy. On the whole, we believe that the government has the better of the argument, but not overwhelmingly so. Materiality is an issue at the time that the prosecutor makes a determination regarding what he must disclose to the defense, and we are unpersuaded by PDS' arguments (not joined by Boyd) to the contrary. Nevertheless, even as a constitutional matter, the trial court must take into account the

reality that the prosecutor has no crystal ball, and must review the exercise of prosecutorial discretion accordingly. In light of the defendant's Fifth Amendment right to due process, as well as his Sixth Amendment right to the effective assistance of counsel, the prosecutor must make the materiality determination, as of the time when the decision is made, with a view to the need of defense counsel to explore a range of alternatives in developing and shaping a defense.

In arguable cases, the prosecutor should provide the potentially exculpatory information to the defense or, at the very least, make it available to the trial court for *in camera* inspection. Further, when the issue appears to be a close one, the trial court should insist upon reviewing such material, and should direct disclosure to the defense if, considering (to the extent possible) the anticipated course of the trial, there is a reasonable probability that disclosure may affect the outcome. All such rulings must be made in full recognition of the reality that *"Brady* is not a discovery rule but a rule of fairness and minimum prosecutorial obligation," and that "compliance with the prosecution's responsibilities under *Brady* is necessary to ensure the effective administration of the criminal justice system." *Curry v. United States,* 658 A.2d 193, 197 (D.C.1995) (citations and internal quotation marks omitted).

### C. *The remedy.*

For the reasons previously stated, we conclude that the statement of Witness No. 1 must be made available to the defense. Whether its nondisclosure at or before trial warrants reversal of Boyd's conviction must be determined on an ad-

---

We would be inclined to follow *Safavian* if we considered ourselves to be at liberty to do so. We believe, however, that the opinion in *Safavian* cannot be reconciled with *Agurs,*

*Bagley,* and *Kyles.* Indeed, the reasoning in *Safavian* parallels and expands upon that of Justice Marshall's *dissenting* opinion in *Bagley.*

versarial basis, with the parties apprised of its contents.

The issue as to the statements of Witnesses Nos. 2, 3, 4, and 5 is more difficult. According to the government, these statements are irrelevant because they pertain to the pursuit of Darryl, and the government claims that Boyd never took part in the chase, but was sitting in the driver's seat of the station wagon. However, this proposition is cast into doubt by the government's position at Watson's trial that Watson, not Boyd, was the driver of the car. Given the critical nature of the issue whether there were three or four participants in the crime, we think that the trial court should have inspected *in camera* the statements of Witnesses Nos. 1–3 (as well as of Witnesses Nos. 4 and 5, had the prosecutor disclosed their existence). *See Smith v. United States,* 665 A.2d 962, 968–69 (D.C.1995).[33] This is especially true in light of the lack of record evidence that any of these witnesses had a compelling privacy or safety interest in non-disclosure. We note in this connection that, although the government argues that there was no error, it acknowledges that "it may have been helpful for purposes of this appeal for the trial court to have conducted an *in camera* review of information pertaining to these undisclosed witnesses." We are satisfied that this acknowledgment was made upon due reflection.

That, ordinarily, would be that. We note, however, that Darryl Hall was murdered more than nine years ago, and that Boyd has been incarcerated for almost all of that time. If we were to order the government simply to turn over the mate-rial for *in camera* inspection, this would surely precipitate further delay. If the judge declined to require the government to provide the defense with the statements, Boyd would in all probability appeal, but his counsel still would not have seen the documents, and the issue still would not have been the subject of adversarial argument in the trial court based on knowledge by counsel of the contents of the statements. We agree with much of the following discussion in PDS' brief:

> Furthermore, as this case makes clear, there is a needless expenditure of judicial resources when the prosecutor, in fact, "tack[s] too close to the wind" and fails to disclose—or even to submit for *in camera* review—material that is clearly, or arguably, material to the outcome of the trial. *Kyles,* 514 U.S. at 439, 115 S.Ct. 1555. In this case, not only has the *Brady* issue become the subject of briefing and supplemental briefing, but there remains a risk of a remand for further trial court proceedings and the potential for appellate review after that. In the words of a District Judge from the Eastern District of Virginia, as he denied a habeas petition on *Brady* grounds, the most effective mechanism for enforcing the due process rights of criminal defendants and avoiding the needless expenditure of judicial resources is to require strict compliance with the demands of *Brady*—irrespective of materiality—in the first instance:
>
> > In this instance, the prosecutor's suppression of impeachment evidence

---

**33.** *Smith* differs from this case because in *Smith,* the prosecutor acknowledged that there were "minor inconsistencies in the testimony as to how the shooting happened." *Id.* at 969. A careful reading of the court's opinion in *Smith* suggests that even without these "inconsistencies," the result would have been the same. In any event, the entire record in this case, viewed also in the light of Watson's trial, and the centrality of the issue to which the *Brady* request was directed, persuade us that, at the least, the judge should have viewed the statements *in camera.*

turned out not to be material. But, that was fortuitous. And, it is not the office of the prosecutor to gamble with the materiality factor when he becomes aware of impeachment evidence. On this occasion, the consequence of the prosecutor's conduct was protraction of this litigation, the expenditure of funds for counsel to explore the issue, and the consumption of limited judicial resources to resolve the issues needlessly created by the conduct at issue. Those consequences were utterly unnecessary.

One would hope that this prosecutor, and all others, would learn from experiences such as this one. But, the most effective assurance that *Brady* will be fulfilled in state prosecutions lies in the full enforcement of its command by the state courts which have the power to order compliance with *Brady* and to discipline those who do not take its commands seriously.

*Schmitt v. True,* 387 F.Supp.2d 622, 656 (E.D.Va.2005).

Accordingly, in the absence of unanticipated circumstances involving the safety of witnesses or related considerations— and such considerations are surely less likely to be of concern more than nine years after Darryl's murder than they were at the time of trial—the trial judge shall order the government to make available forthwith to the court and to counsel for Boyd the identities and statements of Witnesses 1, 2, 3, 4, and 5. If Boyd believes that the statements, individually or collectively, are material, he may move to vacate the conviction on *Brady* grounds.

## III.

### CONCLUSION

For the foregoing reasons, in No. 98–CF–862 we remand the case to the trial court for further proceedings consistent with this opinion. If the trial judge concludes, after the parties have had an opportunity to be heard, that the withholding of the statements of Witnesses 1, 2, 3, 4, and 5, individually or collectively, violated Boyd's rights under *Brady,* she shall order a new trial. If she concludes that the statements were not material, then Boyd's convictions shall stand, subject to Boyd's right to appeal from an unfavorable decision.[34] The trial court's order in No. 00–CO–558 is affirmed.

*So ordered.*[35]

---

**34.** We perceive no merit in any of Boyd's numerous contentions not relating to the government's *Brady* obligation, except that we agree that Boyd's felony murder and premeditated murder convictions merge. "When there is only one killing, the defendant may not be convicted of more than one murder." *Thacker v. United States,* 599 A.2d 52, 63 (D.C.1991); *accord, Cowan v. United States,* 629 A.2d 496, 497 (D.C.1993) (quoting *Thacker*).

**35.** In our supplemental order of August 9, 2005, we directed the parties to brief the question whether the government has complied with its duty of candor to the court. The government has essentially acknowledged that it should have been more forthcoming, both in the trial court and in its brief and oral argument on appeal. The government argues, however, that "lack of perfection does not equal lack of candor." We agree with this proposition, but in our view the phrase "lack of perfection," at least to some extent, understates the problem in this case. Moreover, especially in a case as grave as this one, a presumably experienced homicide prosecutor should not have made the two contrasting opening statements at Watson's trial and at

Boyd's trial without explaining or even disclosing the contradiction. All in all, in our view, the government's performance in this case has not been up to the standards that this court and the Superior Court have a right to expect.

Nevertheless, the government has effectively promised that there will be no repetition of what occurred here, and we take government counsel at their word. Having made our point, we see no reason to prolong in this opinion the discussion of this issue.