**Walter CURRY, Appellant,**

v.

**UNITED STATES, Appellee.**

**No. 93–CF–744.**

District of Columbia Court of Appeals.

Argued March 2, 1995.

Decided May 4, 1995.

---

Jonathan S. Zucker, appointed by this court, Washington, DC, for appellant.

S. Elisabeth Poteat, Asst. U.S. Atty., with whom Eric H. Holder, Jr., U.S. Atty., and

John R. Fisher, Asst. U.S. Atty., Washington, DC, were on the brief, for appellee.

Before STEADMAN, SCHWELB and FARRELL, Associate Judges.

SCHWELB, Associate Judge:

Walter Curry was convicted by a jury of second-degree murder while armed,[1] possession of a firearm during the commission of a crime of violence,[2] and carrying a pistol without a license.[3] His principal contention on appeal is that he was denied the opportunity to present exculpatory testimony because the prosecution violated its responsibilities under *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). Although the government's lengthy delay in providing the defense with the identity of a potential defense witness is troubling, we find no legal error or abuse of discretion on the part of the trial judge. Accordingly, we affirm.

## I.

### THE TRIAL COURT PROCEEDINGS

*A. The Facts.*

On the evening of June 14, 1991, William Spriggs was shot to death in northwest Washington, D.C. According to prosecution testimony at Curry's trial in April 1993, the shooting was witnessed by Tanya Sparrow, who subsequently described herself as an "enforcer" for a drug organization, and by Darnell Williams, then 16 years of age, who was alleged by the defense to be a transvestite prostitute. Ms. Sparrow advised the police on the night of the murder that Curry had committed the murder, and she identified him by his nickname of "Noochie" and by his physical description. Williams, who had allegedly been in Spriggs' company when Curry pursued and killed Spriggs, spoke to

1. D.C.Code §§ 22–2403, –3202 (1989).

2. D.C.Code § 22–3204(b) (1989).

3. D.C.Code § 22–3204(a).

4. Williams testified that he had seen the shooter in the area about a week after the murder, and that he had "visions" of his face which assured that he would never forget it.

the police several hours after the shooting and provided a general and in some respects not quite accurate description.

On December 4, 1991, almost six months after the shooting, Ms. Sparrow identified Curry from a photo spread as "Noochie" and as the killer. She also made a courtroom identification. Approximately a year after the shooting, Williams identified Curry from a five-year-old photograph. He thereafter identified Curry from a line-up photo, and in person at trial.[4]

On the night of the murder, the police also took a statement from James H. Jones, who claimed to have been an eyewitness to the shooting. Jones provided a physical description of the gunman which differed materially from the descriptions provided by Tanya Sparrow and by Williams.[5] Jones' statement also contradicted the prosecution's evidence as to the route taken by the assailant and as to his actions following the shooting. Jones told the police, however, that he purposely tried not to look at the shooter's face. Parts of Jones' statement appear to be based on what an unidentified other person told him.

On December 10, 1991, following Ms. Sparrow's identification of Curry's photograph, a warrant was issued for his arrest. On January 13, 1992, having learned of the warrant, Curry surrendered to the police. Approximately six weeks later, on February 22, 1992, a grand jury returned an indictment charging Curry with the murder of Spriggs and with related weapons offenses.

*B. The Motion for Sanctions.*

Curry's trial was originally scheduled to begin on January 13, 1993, before Judge Henry H. Kennedy, Jr. Two days before that initial trial date, the prosecutor provided Jones' statement to Curry's attorney, de-

5. According to Jones' statement, the shooter was nineteen or twenty years of age "if he was that old," clean-shaven, approximately 5'9" or 5'10" in height, and wore a white T-shirt and brown pants. Curry was 38 years old at the time of Spriggs' death. He is 6'2" tall. The prosecution witnesses claimed that the killer had facial hair and was wearing a black sweatshirt, black jeans, and a baseball cap.

scribing it as "potentially" *Brady*.[6] Jones, however, could not be located, and the case was continued to April 9, 1993, so that the attorneys could endeavor to find him.

On April 8, 1993, the eve of the rescheduled trial date, Curry's new attorney filed a motion to dismiss the indictment or, in the alternative, for sanctions. In his motion, counsel advised the court that, notwithstanding diligent efforts, he had been unable to ascertain Jones' whereabouts. He argued that if timely disclosure had been made, the defense could probably have located Jones and presented his testimony at trial. Counsel prayed for dismissal or, if that relief were denied, for leave "to introduce relevant portions of [Jones'] statement which contradict the testimony of government witnesses." Acknowledging that the government would have no opportunity to cross-examine the witness, defense counsel stated that, because the prosecution was at fault, "such a burden is negligible in comparison to the burden on defendant of having to conduct his defense without the benefit of a most crucial witness."

### C. The Trial Judge's Ruling.

Judge Jose M. Lopez, who had taken over the case from Judge Kennedy, held a hearing on Curry's motion. Curry's attorney described the "intensive investigation" which counsel for both sides had made in an effort to locate James H. Jones. The prosecutor provided additional information, and the facts regarding the efforts to track down Mr. Jones appear to be undisputed.

It appears that Jones, who had been employed as a security guard at Trinity College, left his employment in November 1991, some six months after the murder, but three months before Curry's indictment. He told William Merritt, the Director of Security at

Trinity College, that he was moving to New York City.

Between Curry's arrest on January 13, 1992, and the return of the indictment on February 22 of that year, a police detective went to Jones' former address, a rooming house at 938 S Street, N.W. The detective learned that Jones was no longer living at this location, and that the landlord was looking for Jones because the latter had departed without paying his rent.

Merritt told the attorneys in April 1993 that some time during the preceding year, Jones had called him to request a loan. Jones had indicated on this occasion that he proposed to relocate to Virginia, in the area of Virginia Beach or Norfolk. Jones had left no address or telephone number and, when interviewed, Merritt had no idea where Jones was.

On August 8, 1992, Jones was arrested in New York City for unlawful entry. He missed a scheduled court appearance, and a bench warrant was issued for his arrest. The warrant was still outstanding at the time of Curry's April 1993 trial date. Indeed, Jones was still at large at the time of Curry's sentencing two months later.[7]

Curry's attorney represented to the court that in the spring of 1993, after Jones' identity had been provided to the defense, nobody at the rooming house was aware of Jones' whereabouts. By this time, the post office was unable to provide assistance, for forwarding addresses are retained only for six months. Efforts to locate Jones in Virginia through records of the telephone company and of the Bureau of Motor Vehicles were unproductive. The attorneys also contacted various persons named James Jones in the Norfolk and Virginia Beach area, but none of them turned out to be the man for whom they were searching.

---

6. Curry was initially represented by an attorney from the Public Defender Service, who withdrew at the request of her client. At the time of the first trial date, Curry was represented by Russell Canan, Esq. Following Mr. Canan's appointment to the Superior Court bench, Curry has been represented, both at trial and on appeal, by his present counsel.

The Public Defender Service attorney apparently made a general *Brady* request early in the

case. Mr. Canan made a very explicit *Brady* request on June 25, 1992, which included, *inter alia*, the names of any witnesses who identified as the shooter someone "other than the defendant or his likeness."

7. So far as we are aware, the bench warrant has not been executed. Presumably, counsel would have apprised the court if it had been.

Following extensive arguments by counsel, the judge denied the motion for sanctions. Noting that Jones had left his rooming house without paying his rent, that he had called his former boss for a loan, and that he had failed to appear in court, the judge concluded that Jones probably did not wish to be found. The judge stated that even if the government had disclosed Jones' statement to the defense soon after the return of the indictment, such disclosure would have made no difference, for Jones had already left the area by then and did not wish to be located.

The judge found that the prosecution's failure to disclose Jones' statement to the defense at a "reasonably early stage of the proceedings" was "pure negligence" and "improper." He expressed the opinion that the court should send a "strong message" to the government "regarding this type of negligence." On the other side of the scale, however, the judge considered the community's interest in having serious criminal charges prosecuted, and he concluded that dismissal of the indictment would be an excessively harsh sanction. Turning to defense counsel's proposed alternative remedy, the judge expressed the view that admission in evidence of Jones' statement, without an opportunity for the prosecutor to cross-examine Jones, "may also be too extreme because in effect it would be tantamount to a dismissal." Accordingly, noting that he was exercising his discretion, the judge declined to sanction the government. The case proceeded to trial, and Curry was convicted of all charges. This appeal followed.

## II.

### LEGAL DISCUSSION

*A. The Government's Brady Obligation to Make Timely Disclosure.*

 The prosecutor explicitly conceded in the trial court, and the government continues to acknowledge on appeal, that Jones' statement to the police, which cast doubt as to whether Curry committed the murder, *cf. Barbee v. Warden, Maryland Penitentiary,* 331 F.2d 842, 844 (4th Cir.1964), was exculpatory and subject to disclosure pursuant to *Brady's* command. *Brady* "is not a discov-ery rule but a rule of fairness and minimum prosecutorial obligation." *United States v. Beasley,* 576 F.2d 626, 630 (5th Cir.1978), *cert. denied,* 440 U.S. 947, 99 S.Ct. 1426, 59 L.Ed.2d 636 (1979). Effective compliance with the prosecution's responsibilities under *Brady* is necessary "to ensure the effective administration of the criminal justice system." *United States v. Higgs,* 713 F.2d 39, 44 n. 6 (3d Cir.1983), *cert. denied,* 464 U.S. 1048, 104 S.Ct. 725, 79 L.Ed.2d 185 (1984).

The government also concedes in its brief, and we agree, that it "should have disclosed Jones' statement earlier than [it] did." "[I]t is now well settled that the prosecution must disclose exculpatory material at such a time as to allow the defense to use the favorable material effectively in the preparation and presentation of its case...." *Edelen v. United States,* 627 A.2d 968, 970 (D.C.1993) (citations and internal quotation marks omitted). As the court stated in *United States v. Starusko,* 729 F.2d 256 (3d Cir.1984), "a prosecutor's timely disclosure obligation with respect to *Brady* material cannot be overemphasized," and the practice of delayed production must be disapproved and discouraged. *Id.* at 261 (citations omitted).

In the present case, the material which the prosecutor failed to disclose involved the identity of an apparent eyewitness to an armed murder. It is surely a matter of common knowledge that people move. A person who has witnessed a murder and may believe himself to be subject to possible reprisal is, if anything, more likely to move than the average citizen. Delay in apprising the defense of the existence of such a witness may therefore render an eventual belated disclosure ineffectual. Here, given the time that elapsed between June 14, 1991 (when Ms. Sparrow told the police the "Noochie" had killed Spriggs) and Curry's indictment eight months later, and in light of the detective's discovery during the period between Curry's arrest and indictment that Jones was no longer living at his former address, the government was on notice that Jones could well prove difficult to find and that the trail might quickly turn cold if it were not promptly and energetically pursued. The trial judge thus apparently assumed that

Jones' statement should have been turned over to the defense soon after the return of Curry's indictment.[8] Here, almost a year elapsed between that indictment and the disclosure of Jones' statement. Such delay may imperil a defendant's right to a fair trial, and a conscientious prosecutor will not countenance it.

*B. Materiality and Prejudice.*

■■■ The prosecution's failure to disclose exculpatory information to the defense warrants reversal, however, "only where there is a reasonable probability that, had the evidence been disclosed, the result of the proceeding would have been different." *Edelen, supra,* 627 A.2d at 971 (citations omitted); *see also Kyles v. Whitley,* —— U.S. ——, ——, 115 S.Ct. 1555, 1558, 131 L.Ed.2d 490 (1995). In the present case, the judge found that Jones probably would not have been located even if the defense had learned of his statement at or about the time the indictment was returned. This finding was supported by the record. A detective who, as we have noted, visited Jones' residence shortly *before* Curry was indicted, discovered that Jones was no longer living there and that the landlord was looking for Jones in relation to the latter's unpaid rent. By the time of the trial, a bench warrant for Jones had been outstanding for a substantial period of time. A comprehensive search by the attorneys had failed to turn up any information as to Jones' whereabouts. Under these circumstances, the judge could rationally infer that Jones did not wish to be found and that it would have been extremely difficult to locate him.

Curry vigorously argues for a contrary result. He points out that if the defense had learned of Jones' existence and statement in February 1992, the postal authorities might still have had a forwarding address for him.[9]

Curry also suggests that seasonable disclosure of the statement would have enabled defense counsel to contact the Trinity College security office prior to Jones' telephone call to Merritt, and that Merritt might then have obtained an address for Jones and could also have advised him that his testimony was needed in a murder case.

The question whether earlier disclosure could have been expected to bear fruit was not a one-sided one. The judge could reasonably have decided the issue either way. The judge's finding was essentially a factual one, however, and we must sustain it if there is evidence in the record to support it. *See* D.C. Code § 17–305 (1989). In light of the circumstances, and especially Jones' departure *without paying* his rent and the outstanding bench warrant, we cannot say that the finding was clearly erroneous.

■ Curry argues, however, that nobody could know for sure, after the fact, whether timely disclosure would have enabled the defense to find Jones, and that this uncertainty resulted solely from the prosecutor's failure to carry out his responsibilities under *Brady.* Under these circumstances, Curry insists, the prosecution, and not the defense, should have to bear any adverse consequences. Curry's point is not without some force, for we are not obliged to exempt the government from

> the maxim that no man may take advantage of his own wrong. Deeply rooted in our jurisprudence, this principle has been applied in many diverse classes of cases by both law and equity courts....

*Glus v. Brooklyn Eastern Terminal,* 359 U.S. 231, 232–33, 79 S.Ct. 760, 761–62, 3 L.Ed.2d 770 (1959); *see also Celtech, Inc. v. Broumand,* 584 A.2d 1257, 1260 n. 7 (D.C. 1991). Curry contends that, given the government's culpability, the defense should at

---

8. At oral argument, the government's attorney acknowledged with commendable candor that she was unaware of any legitimate governmental interest that would be served by permitting substantial delay in such disclosure. No claim is made by the prosecution that Jones or anyone else would have been endangered if the statement had been provided to the defense.

9. The judge might well be skeptical of this contention in the light of the detective's visit to the rooming house before the return of the indictment and his discovery that the landlord was already looking for his non-paying erstwhile tenant. An impartial trier of fact could reasonably conclude that if Jones had left a forwarding address, the police, or his creditor-landlord, or both, would have found him.

least have been permitted to introduce into evidence the non-hearsay portions of Jones' statement.

■ We agree that it may arguably have been a *permissible* exercise of the judge's discretion to allow the defense to introduce an edited version of the statement notwithstanding Jones' unavailability for cross-examination. The party whose noncompliance caused the problem, rather than its victim, would then have been placed at a disadvantage. But discretion signifies choice. *Johnson v. United States*, 398 A.2d 354, 361 (D.C. 1979). Where an exercise of discretion is called for, no single conclusion is preordained; "the decision-maker, and not the law, decides." *Id.*

■ If the judge had admitted the statement, the prosecution would have been unable to cross-examine Jones in relation to his opportunity to observe, his recollection, his motivation, and a wide variety of other matters relevant to the credibility of his account. "Cross-examination is the principal means by which the believability of a witness and truth of his testimony are tested." *Davis v. Alaska*, 415 U.S. 308, 316, 94 S.Ct. 1105, 1110, 39 L.Ed.2d 347 (1974). It is "the greatest legal engine ever invented for the discovery of truth." *California v. Green*, 399 U.S. 149, 158, 90 S.Ct. 1930, 1935, 26 L.Ed.2d 489 (1970) (quoting 5 J. WIGMORE, EVIDENCE § 1367, at 29 (3d ed. 1940)). Where a witness cannot be cross-examined, the search for truth is severely impaired. Assuming that the judge had the authority to admit a potentially powerful hearsay statement into evidence, we cannot say that he was legally obliged to do so.

■ Finally, Curry contends that the judge's exercise of discretion was undermined by errors of fact and law. *See In re J.D.C.*, 594 A.2d 70, 75 (D.C.1991) (judicial discretion must be founded upon a sufficient factual predicate and upon correct legal principles). We do not agree. The judge's findings of fact, as we have noted, were reasonable and well-grounded in the record. We likewise discern no underlying error of law. There was no abuse of discretion.[10]

### III.

### CONCLUSION

■ For the foregoing reasons, Curry's convictions must be and each is hereby

*Affirmed.*[11]

---

10. Curry asserts that the judge incorrectly considered "the people's interest" and "the unfair burden against the government" in declining to admit Jones' statement. He cites no authority, and we know of none, for the exclusion of these considerations from the judge's calculus. On the contrary, the essence of the judge's discretionary task was to weigh the damage to the government from the admission of the evidence against the possible prejudice to Curry from its exclusion.

We note the judge's comment that admission of the statement "may also be too extreme because in effect it may be tantamount to a dismissal." If the judge had permitted the defense to introduce the statement, he could have tempered any prejudice to the government by candidly disclosing to the jury the circumstances of its admission, and by instructing the jurors that in assessing the weight to be given to Jones' statement, they might properly consider the fact that Jones could not be cross-examined. This alternative was not suggested to the judge, however, and we do not believe that he abused his discretion by failing to invoke it *sua sponte.*

11. We deal briefly with Curry's remaining contentions. The judge did not abuse his discretion by any of the following rulings:

(1) the denial of Curry's motion for a second continuance, *see Edelen, supra,* 627 A.2d at 972;

(2) the denial of post-trial discovery, *see Gibson v. United States,* 566 A.2d 473, 476–78 (D.C. 1989);

(3) the curtailment of the cross-examination of Tanya Sparrow as to her enforcement activities for a drug gang, and of Darnell Williams as to his alleged activities as a transvestite prostitute, *see, e.g., Springer v. United States,* 388 A.2d 846, 854–55 (D.C.1978); the judge could reasonably view both subjects as more prejudicial than probative, and, as to Ms. Sparrow, Curry made no sufficient or non-speculative proffer that the decedent may have been murdered by a member of the drug gang for which she worked, or that Ms. Sparrow was attempting to shield any such person, *see Johnson v. United States,* 552 A.2d 513, 516–18 (D.C.1989); and

(4) the admission of the testimony of the decedent's wife as to the decedent's state of mind, *see*

*Bennett v. United States*, 375 A.2d 499, 503 (D.C. 1977); moreover, any error in this regard was harmless.