983 A.2d 1012 (2009)
In re C.B.; I.B., Appellant.
Nos. 07-FS-438, 07-FS-449.
District of Columbia Court of Appeals.
Argued January 22, 2009.
Decided November 25, 2009.
Leslie J. Susskind, appointed by the court, for appellant.
Alice Stevens, Assistant Attorney General for the District of Columbia, with whom Peter J. Nickles, Attorney General, Todd S. Kim, Solicitor General, and Donna M. Murasky, Deputy Solicitor General, were on the brief, for appellee.
Lewis Franke, Bethesda, appointed by the court, for appellees, A.B. and E.B.
Before WASHINGTON, Chief Judge, REID, Associate Judge, and PRYOR, Senior Judge.
REID, Associate Judge:
I.B., appellant and biological mother of C.B., challenges the Family Court's order denying her motion for review of a Magistrate Judge's order of October 31, 2006, "Findings of Fact, Conclusions of Law and Order Appointing Permanent Guardians and Closing Neglect Case," ("the guardianship order"). We deem it unnecessary to address most of I.B.'s arguments, either because she failed to raise them in the trial court, or because they are related to the primary issue before us. I.B. challenges the guardianship order, in part, because she claims that there was insufficient record evidence to satisfy the statutory factors set forth in D.C.Code § 16-2383(d), particularly subsection (d)(3) pertaining to the quality of the interaction and interrelationship between C.B. and one of the petitioners. Because only the Magistrate *1013 Judge examined evidence provided by three "witnesses" pertaining to that factor, and since the parties did not have an opportunity to examine or cross-examine these "witnesses," we are constrained to remand this matter to the Family Court with instructions to reopen the "adjudicatory [guardianship] hearing" to permit the parties to examine and cross-examine A.B., E.B., and the therapist.

FACTUAL SUMMARY
This case has had a long and contentious history. The record and the Magistrate Judge's findings of fact show that the District of Columbia filed a neglect petition pertaining to C.B., who was born in 1993, because her mother failed to pick her up from school when C.B. was four years old. A hearing on the neglect petition revealed that I.B. abused substances, including cocaine and alcohol, had mental health issues, often left her children alone, and lived with C.B. and her then fifteen-year-old son in a vermin-contaminated and cluttered residence, with little food. In February 1998, the Family Court concluded that I.B.'s children were neglected under D.C.Code § 16-2301(9)(B) because I.B. was unable to discharge her parental responsibilities. The Family Court initially placed C.B. in the care of relatives who retained custody of C.B. until sometime around 2000, when A.B., C.B.'s maternal uncle, and his wife, E.B., agreed to take custody of C.B.
Thereafter, the Child and Family Services Agency ("CFSA") and the Family Court explored permanency goals of reunification (with I.B.) and guardianship. A.B. and E.B. filed their motion for permanent guardianship in October 2003.[1] Hearings on the motion commenced on June 28, 2004, and continued on September 20, November 2, and November 22, 2004. The parties filed a joint stipulation that C.B. *1014 wanted to live with her biological mother, I.B. Lori Gloster, CFSA's social worker assigned to C.B.'s case from the end of July 2002 to May 2004, testified that C.B. was then in the care of A.B. and E.B., and was "a very pleasant 11-year old" who was "very, very bright ..., very articulate[,]... very well-rounded, well adjusted" and "in good health." Ms. Gloster made monthly visits to the home of A.B. and E.B. where she observed the interaction of the family with C.B., including the three biological children of A.B. and E.B. C.B. had "blended into the family," and she had "a very good relationship" with A.B. and E.B. There was adequate food in the home; C.B. was an honor roll student in school; and she commented to Ms. Gloster that "she likes it there at the home" and that A.B. and E.B. "take very good care of her" and "they are fair." C.B. shared a room with her cousin, one of A.B. and E.B.'s children.
Ms. Gloster had difficulty getting in touch with I.B. when she was assigned as C.B.'s social worker. She began to communicate with I.B. by e-mail to arrange for supervised weekly visits between I.B. and C.B. She was unable to arrange the first visit until September 2002, but the supervised visits were "pretty consistent after that." The last supervised visit between I.B. and C.B. occurred in September or October of 2003. Thereafter I.B. was to have arranged unsupervised visits with C.B. through A.B. and E.B. However, after the supervised visits ended, there were no visits between C.B. and I.B. until February 2004. Ms. Gloster recalled that in January when she visited C.B., the child "just burst into tears ... because she was so upset ... her mom was making up excuses about visits." Ms. Gloster called I.B. the next day to tell her what had happened and "how important the visits were to C.[B.]"
I.B. refused services that CFSA sought to arrange, saying "she already had mental health services, and she already had housing, and she didn't need parenting." When Ms. Gloster asked I.B. to "provide... information of the services that she was receiving," I.B. failed to do so. Sometimes I.B. "would hang up" on Ms. Gloster. The social worker was not aware of any financial support for C.B. from I.B., even though I.B. maintained that she was employed by the Department of Mental Health. Ms. Gloster had no contact with the putative father of C.B., and was not aware of any contact between him and C.B. On cross-examination by counsel for I.B., Ms. Gloster asserted that the supervised visits between C.B. and I.B. went "very well," and that C.B. "loved to visit with her mother." Ms. Gloster never visited I.B.'s home and could not verify I.B.'s employment because I.B. "would not give [Ms. Gloster] any information about her employment or the services she was getting." Ms. Gloster discussed reunification with I.B. and the services she would have "to participate in in order to have C.[B.] returned" to her; I.B. "refused them."
A.B.'s testimony centered on C.B.'s integration into the structure of his immediate family (wife and three children) as well as his church, his love for C.B., his wife's love for her, and his view of C.B. as his daughter. He discussed efforts to involve I.B. in family activities, especially birthday parties and holiday celebrations. He expressed willingness to provide a home for C.B. as long as the need existed. He sought guardianship of C.B. because he did not want his sister's (I.B.'s) parental rights to be terminated. A.B. was concerned about C.B.'s emotional state when she first arrived in his home, and he arranged therapy for her. A.B. expressed concern about I.B.'s erratic visits with C.B. and was concerned about unsupervised visits between C.B. and her mother because *1015 of his belief that I.B. abused alcohol. A.B. acknowledged that I.B. gave him money for C.B., bought items for C.B. that she needed, and she called to request visits with C.B.
I.B. opposed the proposed guardianship of her brother and his wife, A.B. and E.B. According to the testimony of I.B., she earned a Bachelor of Administration degree in business management. She lived in a one-bedroom apartment with her son; she obtained the apartment through the Department of Mental Health. She was being treated for depression with group therapy and medication. She complained about her difficulty in arranging visits with C.B., her brother's failure to take or return some of her calls, and his non-compliance with court orders. She maintained that she has a good relationship with C.B., engages in activities with the child such as window shopping, watching movies, and going to church. She has purchased clothes, shoes and other things for C.B. In her opinion, C.B. was not receiving good care from A.B. and E.B. C.B. told her that she has been spanked and left home alone. I.B. claimed that she had been a victim of robbery, rape and assault, and had been molested by her father and brother. She insisted that her children were not neglected. She denied that she had ever tested positive for cocaine, and she claimed that she takes a lot of medicine and lives around "a lot of unscrupulous people." In her view, she did not need services offered by CFSA because she had obtained parenting skills through COPE (Creating Opportunities for Parent Empowerment).
I.B.'s father testified that he visits the home of A.B. and E.B. at least once a week. He described their home as "[a] wholesome home environment" with a "family relationship." In his view, C.B. was "well taken care of." He sees his daughter, I.B., once or twice a month. Within the two months prior to his testimony, he had seen I.B. in an intoxicated state. He knew she was intoxicated "[f]rom having been around her all her life and smelling [the alcohol and seeing] the way she responds ... in conversations, her total reactions." She is "[v]ery indifferent[,][v]ery loud." When I.B. is not drinking, she is "normal." In response to a cross-examination question as to whether I.B.'s father had ever seen his daughter "with any drinks in her hand," he replied, "Yes I have."
Although the guardianship hearings took place in Fall 2004, the Magistrate Judge did not issue findings of fact and conclusions until October 31, 2006. The delay apparently is attributable to efforts to work out a visitation schedule for I.B. At a hearing on February 3, 2005, which the Magistrate Judge described as "technically permanency" to be "follow[ed] up with [a] status hearing," the judge announced that "guardianship would be awarded to" [A.B. and E.B.] because she "absolutely believe[d] that that is in the child's best interest at this time," and she did not "believe that [I.B. was] in a position at this time to care for [C.B.]," but that she (the judge) needed to figure out the visitation arrangement. The hearing became quite contentious as I.B. took issue with the Magistrate Judge's pronouncements and the judge indicated that I.B. "behave[d] like a child." In addition, counsel for A.B. expressed frustration with trying to work out visitation with I.B. The Magistrate Judge expressed her desire that A.B. and I.B. "behave like adults, behave like sister and brother." The judge also made clear that "C.[B.] loves her mother, ... wants to spend time with her mother," and the judge "want[ed] [I.B.] to be healthy enough and appropriate with her daughter," but at that time the judge did not believe that I.B. could manage "all the day-to-day" care. The judge further stated *1016 that A.B. was "doing an incredible job raising [C.B.] ..., a great job [and][t]hat's why [he] gets guardianship," but that C.B. "deserves time with her mother." In her written order of February 3, 2005, the Magistrate Judge ordered I.B. and A.B. to "participate in mediation to address issues of visitation," and in the interim ordered supervised visitation.
On February 25, 2005, the guardian ad litem and A.B. and E.B. filed a motion "to reopen the record for an evidentiary hearing on visitation, for a stay of issuance of guardianship order and for a guardianship order provision that limits overnight visitation," which the Magistrate Judge granted on March 8, 2005. Apparently the impetus for the motion was an alleged incident that had occurred in mid-December 2004 when C.B. remained in her mother's home overnight instead of being returned to A.B.'s home.[2]
During an April 20, 2005 "guardianship/permanency hearing," counsel for I.B. asserted that I.B. wanted her daughter back and would like to have weekly visits. I.B. complained about visitation arrangements and about allegedly not having an opportunity to testify at the neglect hearing, and A.B. also complained. The Magistrate Judge attempted to resolve their disagreements. Another discussion of visitation took place at a May 17, 2005 permanency hearing. A.B. asserted that he had "done everything [he] possibly could to make C.B. available [to visit] I.B. as often as [he] possibly could" but that his concern revolved around C.B.'s very late night returns after 10:00 p.m. and as late as 1:00 a.m. I.B. took issue with A.B.'s statement and became angry, stating that she was "not an imminent danger to the community" and that "[t]here is no reason for someone to doubt or have to monitor [her] activities." As I.B. continued her statements, ignoring the judge's efforts to stop her, the Magistrate Judge stated that "it just doesn't help when you go off on those rampages." I.B. insisted that it was not a rampage and declared that she was "disgruntled because this is a corrupt system." She continued: "For seven years, my kids weren't neglected. How do you expect me to act?" As the discussion and disagreement continued about what time I.B. would return C.B. after visits, the Magistrate Judge began to think in terms of having a neutral agency observe the visits and to give the court "a really honest assessment ... of how those visits are going." I.B. protested and insisted that the judge was "looking at it from one side" because she did not intend to return C.B. to her custody.
During an evidentiary hearing on June 17, 2005, held in response to the guardian ad litem and A.B. and E.B.'s motion for an evidentiary hearing on visitation, A.B. testified that, over the past three months, visits between C.B. and I.B. had been "pretty regular," and that the "big issue" concerned the time when C.B. returned from a visit or overnight stay with her mother. He reported that on the previous night when he returned home, C.B. was not there. He went to I.B.'s home to get C.B. and a "tug of war" ensued over where C.B. would stay that night. He also recounted other incidents in which I.B. picked up C.B. without his knowledge or *1017 that of his wife. He expressed his and his wife's "frustrat[ion] with the situation."
The Magistrate Judge questioned the social worker assigned to C.B. since May 11, 2004, Lisa Stevens Collins, who described I.B.'s home as a one bedroom apartment that was clean. I.B. at times was supervising another child (not her son) while C.B. was visiting. The son, who resided with his mother, expressed concerns about I.B. being intoxicated but Ms. Stevens did not confirm the intoxication report.[3]
At the conclusion of the social worker's testimony, the Magistrate Judge informed the parties that she wanted to talk with C.B. "to get a sense of her comfort level in all of this and a sense of how she spends her time with her mom, how she spends her time generally as a child, even at home with [A.B. and E.B.] and how well she's basically cared for when she's visiting ...; whether she's happy or whether she is the rag doll ... being tugged on, ... being fought over because that's what's happening...." The judge indicated that she might "have Beyond Behaviors visiting with mom and C.[B.] to see whether or not mom is appropriate and who's coming in and out of her home, and whether she has beer in the refrigerator and [whether] she's downing beers."
The judge spoke with C.B. on the record but out of the presence of the parties; a court staff member was present during the interview. C.B. told the judge: "I don't want to live with my aunt any more. I don't have a problem with my uncle, just my aunt." C.B. stated that her aunt "makes [her] do a lot of work," and that when she's tired, her aunt wakes her up. After C.B. ran away to her mother's house, things got worse and her mother and uncle were fighting. C.B. gets along with her cousins. She enjoys being with her mother and they have fun. Her aunt is "real strict," would be "in her face," imposed time limits on getting the dishes done, and assigned her to do the dishes alone on Sundays; she did not "mind washing the dishes" but did not want "fussing" at her or time limits for getting the job done. C.B. asked whether it was possible during the summertime to "spend ... some weeks" with I.B.
At the June 27, 2005 hearing, the Magistrate Judge declined to issue the guardianship order because the issue of visitation had not been resolved. The judge summarized her June 17 on-the-record conversation with C.B., but she did not mention C.B.'s comments about her aunt. The judge depicted C.B. as "torn between her uncle and her mom," as a person who loved and adored her uncle but who would not be happy without visits with her mother. She believed that I.B. "takes seriously the time she has with C.[B.], and what she does with her.... They go to the movies, they go window shopping, ... she's teaching her to cook. She's supervising her." Her basic concern was the sleeping arrangement when C.B. visited her mother "because [C.B.'s] between the couch, the floor, and [her mother's] bed." The judge informed the parties that she needed information due to the conflict between A.B. and I.B., and specified that she wanted Beyond Behaviors, the social worker and the guardian ad litem to visit I.B.'s home while C.B. was there for one summer month. She explained to I.B. that she *1018 would have to cooperate with the process and to give the designated persons "full access" to her home. When A.B. and E.B. asked about the guardianship order, the judge responded: "I'm not issuing it right now" because the judge "want[ed][her] order to reflect" the visitation schedule. The judge ordered C.B. to stay with I.B. from July 5, after 6:00 p.m. to August 7 until 8:00 p.m.
During a review hearing on August 15, 2005, the Magistrate Judge announced that she was thinking "placement" and "not thinking so much visitation any more." The guardian ad litem reported that he had made one visit to I.B.'s home while C.B. was there. C.B. "seemed to be very happy" and voiced a desire to stay longer. I.B. "was quite pleasant" and the relationship between I.B. and C.B. "seemed to be fine." The judge said that CFSA and Beyond Behaviors made similar reports; that Beyond Behaviors reported that C.B. wanted to stay with I.B. for one year during the school year. The District requested an updated mental health evaluation of I.B. A.B. revealed that he had had no problems visiting C.B. during the summer when she was with her mother, and that C.B. went on vacation with his family and everyone had a good time.
The parties reconvened on September 15, 2005; I.B. was not present. Although the Magistrate Judge apparently had revealed to A.B. in mid-June 2005, C.B.'s negative comments about E.B., she had not informed others, including I.B. and her attorney, and the guardian ad litem. The judge stated that C.B. was "unhappy" and "doesn't feel that E.B. is the nicest person in the world." C.B. "doesn't like being with [E.B.], she feels that [E.B.] is mean to her and treats her differently when [A.B.] is not at home." C.B. "adores her uncle, just loves him...." The judge's "thinking was to see where the mother was, because the child wanted to be with her mom, and [she] wanted to try to make that happen if [she] could." That is why she allowed C.B. to be with her mother during the summer months and arranged for Beyond Behaviors to observe. But, said the judge, "[I.B.] is not doing anything to help me in this process." The judge apparently referred to I.B.'s avoidance of calls from Beyond Behaviors and attempts to schedule visits to her home.
The Magistrate Judge inquired whether A.B. had spoken with E.B. regarding C.B.'s concerns. He responded that there had been a "big blow up" but he had E.B. and C.B. to "sit and talk." They had "talked about [the concerns] extensively" and he "sought counseling through [their] ministry for [his] wife" and for him. Before signing the guardianship order, the judge "need[ed] to know that C.B.'s comfortable and that there is some accord between [E.B.] and [C.B.]." A general discussion between the judge and A.B. and his counsel followed. The judge expressed some ambivalence about what to do since C.B. desired to live with her mother but the judge could not "just reunify [C.B. with I.B.] without feeling confident that it is the thing to do," but that C.B. could spend two weeks to a month in the summer "once guardianship is granted." The possibility of family therapy was explored. At the April 3, 2006 hearing, relationships between the parties, including that between I.B. and A.B., appeared to be more cooperative and the discussions centering on therapy were generally positive.
By the time of the June 15, 2006 hearing, the Magistrate Judge was moving toward a permanency goal of guardianship. The judge reviewed a therapy report which disclosed that C.B. "has adjusted and adapted to [A.B. and E.B.'s] home, and ... as long as [C.B. can continue to have visits with I.B.], then everything *1019 should be okay and stable." A.B., E.B., and C.B. were present in court, but I.B. was not. I.B.'s attorney had called her and left messages; she reiterated that I.B. wanted C.B. to be returned to her care. The Magistrate Judge spoke with E.B. and C.B. without the presence of counsel for A.B. and E.B. According to the judge's report, C.B. no longer wanted family therapy but did desire individual therapy; and C.B. "feels that she and her aunt can talk about things." The judge declared that "it is in [C.B.'s] best interest to be with her aunt and uncle, that that is at this time ... the most appropriate place for her to be." The judge decided not to put any conditions on visitation between C.B. and I.B. and to instead, issue a "reasonable visitation" order. Overnight visits would be allowed "as long as things are appropriate."
The Magistrate Judge issued the written guardianship order on October 31, 2006. Her findings of fact concentrated on the testimony given at the evidentiary hearing but did not explicitly discuss the statutory factors contained in the guardianship statute. The judge reached at least two substantive conclusions: (1) A.B. and E.B. "established by a preponderance of evidence that permanent guardianship is in the child's best interests"; and (2) "Termination of parental rights, or return to the parent is not appropriate for the child because the father[][is] not involved[4] and the mother is not able, at this time, to provide and care for the child." Moreover, the judge found that "the proposed permanent guardian is suitable and able to provide a safe and permanent home for the child," and that I.B. "is not ready to provide a safe and nurturing home environment for [C.B.] and it would not be in [C.B.'s] best interest to reunify with [I.B.] at this time." The court declared that C.B. "has done well in the care of [A.B. and E.B.] and it would be contrary to her best interest to disrupt the only home she has known for six years."
The Reviewing Judge issued a twenty-five page "Memorandum Opinion and Order Denying Mother's Motion for Review" on March 28, 2007.[5] The Reviewing Judge apparently conducted a de novo review of the record prior to affirming the Magistrate Judge's decision to establish the guardianship and to close the neglect file. Contrary to I.B.'s argument, the judge saw nothing in either the guardian ad litem's report on his July 30, 2005 visit to I.B.'s home, or the August 7, 2005 report of Beyond Behaviors, which supported a finding that I.B. was capable of parenting C.B., or which was helpful to the determination of permanency for C.B. Two subsequent reports from Beyond Behaviors revealed I.B.'s "fail[ure] to make herself available to Beyond Behaviors." Thus, despite some comments favorable to I.B. in both the guardian ad litem's and Beyond Behaviors' reports, the judge concluded that neither demonstrated I.B.'s ability to parent C.B. nor served as a basis for ordering reunification of mother and daughter.
The Reviewing Judge rejected I.B.'s due process assertion, which was based primarily on the time lapse between the end of the 2004 evidentiary hearing and the *1020 Magistrate Judge's issuance of her order in October 2006. The judge saw nothing problematic about "the unique, extended visit experiment" during which C.B. stayed with her mother for one summer month, even though "the Magistrate Judge had pushed the limits of the disfavored approach of `wait and see.'"
With respect to I.B.'s argument about the alleged absence of findings under the factors set forth in D.C.Code § 16-2383(d), the reviewing court declared that "[t]here is no requirement in the Code that the trial court's opinion express the analysis of the factors in any particular format or that the findings of fact literally include each factor's technical code citation." The court examined each of the statutory factors in the context of the Magistrate Judge's findings and determined that the Magistrate Judge not only considered the statutory factors, but also that her decision "rationally reflects that the trier of fact weighed them[6] in favor of granting guardianship."
In discussing the third factor set forth in D.C.Code § 16-2383(d)(3), consisting of "the quality of the interaction and interrelationship of the child with his or her parent, siblings, relatives, and caretakers, including the proposed permanent guardian," the reviewing court emphasized the Magistrate Judge's findings that I.B. "did not consistently attend the visits" with C.B. scheduled from July 2001 to July 2002; that "[s]he frequently arrived late or did not come at all, which left [C.B.] feeling dejected." Thus, I.B. "caused" "observable and documented emotional distress ... to her daughter." These findings were supported, in part, by the testimony of Ms. Gloster, and demonstrated that "the `quality of [I.B.'s] interaction with [C.B.] was detrimental to the child, because of the way in which the mother failed to be sufficiently consistent with visiting opportunities." In discussing the Magistrate Judge's findings concerning C.B.'s interactions with A.B. and E.B., the reviewing court relied on the reference to Ms. Gloster's testimony and the testimony of A.B., but did not explicitly mention C.B.'s negative comments about E.B. The court described the findings on the third statutory factor as "balanced" and "reflect[ing] thoughtful consideration and weighing of the child's solid `interaction' between caretakers who are pro-active in managing her therapeutic needs with the child's conflicted feelings," that is, the child's desire not "to lose her connection to her biological mother."
As for I.B.'s contention that the Magistrate Judge "did not obtain the child's express, personal consent for the establishment of the guardianship," the reviewing court cited the words of D.C.Code § 16-2383(b) specifying that: "If the child is 14 years of age or older, the court shall designate the permanent guardian selected by the child unless the court finds the designation is contrary to the child's best interests." The court pointed out that C.B. was only thirteen-years-old at the time, and that, "[p]lainly, the law does not require consent from any child who has not attained the age of 14 years."
With regard to the allegedly erroneous factual finding that I.B. had made only "sporadic visits" to C.B., and I.B.'s complaint that A.B. and E.B. were not allowing her to see her daughter, the Reviewing Judge stated that the visitation complaint was "ultimately resolved in favor of the guardians," and "revolved around credibility *1021 factors." Furthermore, the court asserted that given I.B.'s "longstanding mental health problems and alcohol abuse ..., it makes no sense to return [C.B.] to her mother, especially not as an abrupt move after being out of the mother's care for six years."

ANALYSIS
Given the Magistrate Judge's factual findings, reflecting considerable time spent on this case, and the Reviewing Judge's extensive analysis of the record, we center our attention on only one of I.B.'s contentionsher central claim that there was insufficient record evidence to show that the statutory factors contained in D.C.Code § 16-2383(d) were met and that the guardianship was in C.B.'s best interest. Our review prompts no concern except with respect to one aspect of one factorD.C.Code § 16-2383(d)(3), the quality of the interaction between C.B. and the guardians. While the Reviewing Judge discusses the interaction of C.B. and her uncle, A.B., she does not focus on the negative testimony which C.B. gave about her aunt on June 17, 2005. That testimony was taken by the Magistrate Judge out of the presence of the parties and their counsel. The judge apparently informed A.B. of this testimony shortly after it was given, but not until September 2005 did the Magistrate Judge tell the others, including I.B. and her counsel, that C.B. was "unhappy," "doesn't feel that E.B. is the nicest person in the world," "doesn't like being with [E.B.]," and "feels that [E.B.] is mean to her and treats her differently when [A.B.] is not at home."
We turn now to the statute which guides our review of this case. The District of Columbia Foster Children's Guardianship Act ("the Guardianship Act"), D.C.Code §§ 16-2381 (2009 Supp.), is designed to "[e]ncourage stability in the lives of certain children who have been adjudicated to be neglected and have been removed from the custody of their parent by providing judicial procedures for the creation of a permanent guardianship...." D.C.Code § 16-2381(1); see also W.D. v. C.S.M., 906 A.2d 317, 326 (D.C.2006) (quoting § 16-2381). The Guardianship Act attempts to ensure that "the constitutional rights of all parties" are safeguarded and "the fundamental needs of children" are addressed. D.C.Code § 16-2381(2). As we explained in In re A.G., 900 A.2d 677 (D.C.2006):
The statute strikes this balance by "encompass[ing] a number of procedures aimed at protecting children from emotional and physical harm while at the same time seeking to repair and maintain family ties." It provides for "a measure of flexibility ... to allow the [District] to provide permanence for a child without terminating the parent's rights." The statute provides for secure placement of the child while authorizing both visitation between parent and child and continuing involvement by [District] agencies.
Id. at 681 n. 6 (citations omitted). Moreover, the Guardianship Act explicitly states the standards for the issuance of a guardianship order by the Family Court; D.C.Code § 16-2383(c) provides:
(c) The court may issue a guardianship order only if the court finds that:
(1) The permanent guardianship is in the child's best interests;
(2) Adoption, termination of parental rights, or return to parent is not appropriate for the child; and
(3) The proposed permanent guardian is suitable and able to provide a safe and permanent home for the child.
Undoubtedly, to assist in striking the balance between the constitutional rights of all parties and the fundamental needs of *1022 the child, the Guardianship Act requires the Family Court to schedule "an adjudicatory hearing" in accordance with D.C.Code § 16-2386. Section 16-2388 grants to "[e]very party ... the right to present evidence, to be heard in his or her own behalf, and to cross-examine witnesses called by another party." D.C.Code § 16-2388(c). In addition, § 16-2388(d) mandates that "[a]ll evidence which is relevant, material, and competent to the issues before the court shall be admitted." The adjudicatory hearing and the procedures and standards outlined in § 16-2388(c) and (d) will enable the Family Court to perform its ultimate task under § 16-2388(f), determining the best interests of the child: "The court may enter, modify, or terminate a guardianship order after considering all of the evidence presented, ... and after making a determination based upon a preponderance of the evidence that creation, modification, or termination of the guardianship order is in the child's best interests."
Despite the extensive and sensitive work of the Magistrate Judge and the Reviewing Judge in this case, what gives us pause in examining the statutory provisions and the record before us is (1) the mandate in § 16-2388(c) that a party "shall have the right to ... cross-examine witnesses called by another party" during an adjudicatory hearing; and (2) the explicit language in § 16-2388(d) that "[a]ll evidence which is relevant, material, and competent to the issues before the court shall be admitted." C.B.'s comments to the Magistrate Judge on June 17, 2005, about E.B. clearly were relevant to part of the third factor in § 16-2383(d), "the quality of the interaction and interrelationship of [C.B.] with ... the proposed permanent guardian," but all of the parties were not informed about C.B.'s negative comments about her aunt until September 2005, and neither I.B. nor the guardian ad litem were given an opportunity to examine A.B. and E.B. on the record about C.B.'s comments and their impact on the suitability of A.B. and E.B. as permanent guardians of C.B.
The Magistrate Judge apparently realized that C.B.'s negative comments about E.B. and her unhappiness based on her perception that her uncle's wife treated her differently from the other children in the household would affect the guardianship decision. Therefore, the judge appeared to adopt a twofold strategy: determine whether reunification still might be a viable option and work to resolve the difficulties between C.B. and E.B. While the Magistrate Judge's approach is understandable, it conflicted with the statute's concept of an adjudicatory hearing and the right of every party to cross-examine witnesses called by another party. Technically, the court "called" E.B. and A.B. and questioned them about C.B.'s relationship with E.B. Nevertheless, on September 15, 2005, when A.B. responded to the questions of the judge, he was testifying, in essence, in behalf of the petitioners, A.B. and E.B. Moreover, when the judge spoke with A.B. and E.B. on June 15, 2006, they also were testifying, in essence, as witnesses for the petitioners. In addition, the therapist who authored the report stating that C.B. "has adjusted and adapted to [A.B. and E.B.'s] home," which the Magistrate Judge reviewed on June 15, 2006, was testifying for the petitioners. Yet, I.B. and the guardian ad litem did not have an opportunity to examine A.B., E.B. or the therapist in June 2006.
"`Where a witness cannot be examined, the search for the truth is severely impaired.'" Tyree v. Evans, 728 A.2d 101, 103 (D.C.1999) (quoting Curry v. United States, 658 A.2d 193, 199 (D.C.1995)). While "[t]he extent of cross-examination [of a witness] with respect to an appropriate *1023 subject of inquiry is within the sound discretion of the trial court," ... "[a] complete denial of the opportunity to cross-examine... is impermissible." Id. (internal quotation marks and citations omitted; second alteration in original); accord, In re L.D.H., 776 A.2d 570, 573 (D.C.2001). Furthermore, "interrogation by the judge is not a sufficient substitute for cross-examination by counsel." Tyree, supra, 728 A.2d at 105.
Despite the obvious passage of time since the issuance of the guardianship order in October 2006, in light of D.C.Code §§ 16-2388(c), (d), and (f) and the legal principles pertaining to a party's right to examine or cross-examine witnesses, our review of the record in this matter constrains us to remand this case to the trial court with instructions to promptly reopen the adjudicatory guardianship hearing to permit the parties to examine A.B., E.B., and the therapist on the record concerning C.B.'s relationship with E.B. Following that testimony, the Magistrate Judge should modify her findings and conclusions under D.C.Code § 16-2383(d)(3) and issue a revised order; the Reviewing Judge should review the revised findings, conclusions, and the revised order.
So ordered.
NOTES
[1] The motion was filed under D.C.Code § 16-2383 which provides:

Grounds for the creation of a permanent guardianship.
(a) A guardianship order may not be entered unless the child has been adjudicated to be neglected pursuant to section 16-2317 and has been living with the proposed permanent guardian for at least 6 months.
(b) If the child is 14 years of age or older, the court shall designate the permanent guardian selected by the child unless the court finds that the designation is contrary to the child's best interests.
(c) The court may issue a guardianship order only if the court finds that:
(1) The permanent guardianship is in the child's best interests;
(2) Adoption, termination of parental rights, or return to parent is not appropriate for the child; and
(3) The proposed permanent guardian is suitable and able to provide a safe and permanent home for the child.
(d) In determining whether it is in the child's best interests that a permanent guardian be designated, the court shall consider each of the following factors:
(1) The child's need for continuity of care and caretakers, and for timely integration into a stable and permanent home, taking into account the differences in the development and the concept of time of children of different ages;
(2) The physical, mental, and emotional health of all individuals involved to the degree that each affects the welfare of the child, the decisive consideration being the physical, mental, and emotional needs of the child;
(3) The quality of the interaction and interrelationship of the child with his or her parent, siblings, relatives, and caretakers, including the proposed permanent guardian;
(4) To the extent feasible, the child's opinion of his or her own best interests in the matter; and
(5) Evidence that drug-related activity continues to exist in a child's home environment after intervention and services have been provided pursuant to section 6-2104.01 § 4-1301.06a. Evidence of continued drug-activity shall be given great weight.
[2] CFSA sent a report to the Magistrate Judge detailing the report of the incident during which I.B.'s son believed his mother had been drinking. The son had difficulty waking I.B. and when she finally awoke they had an altercation. The social worker who prepared CFSA's report visited C.B. in late January 2005. According to the social worker, C.B. "stated that she wanted to remain in the home of [A.B. and E.B.] due to the fact, that [they] are able to take care of her"; I.B. "smokes, which makes her cough"; and "as long as she can visit her mother, she wants to remain in the home of [A.B. and E.B.]."
[3] Although I.B.'s son was listed as a proposed witness at the evidentiary hearing, he did not testify. An "unidentified speaker" at the June 17, 2005 hearing, reported that I.B. had filed an assault complaint against her son and he had "to stay away from his mother's house... [and that] he [was] afraid to testify because [I.B. was] going to kick him out of the house...." I.B. stated that the assault charge was "supposed to have been ... dropped."
[4] By that time, C.B.'s father had been located and he gave his consent to the proposed guardianship.
[5] I.B. contended that the Magistrate Judge (1) abused her discretion and made "a serious factual error" regarding record evidence; (2) denied I.B. due process by issuing an order based on "testimony that was two years old"; (3) failed to make "specific findings pursuant to D.C.Code [§] 16-2383(d)"; and (4) erred "in finding that the visits between [I.B.] and [C.B.] were sporadic."
[6] The statutory factors include "continuity of care," the "physical, mental, and emotional health of all individuals involved ...," quality of the child's "interactions and interrelationship" with the parent and proposed permanent guardian, and the child's opinion of her best interests. See D.C.Code § 16-2383(d), supra note 1.